# OKLAHOMA TAX COMMISSION *v.* SAC AND FOX NATION

No. 92–259.   Argued March 23, 1993—Decided May 17, 1993

*David Allen Miley* argued the cause for petitioner. With him on the briefs was *David Hudson.*

*Edwin S. Kneedler* argued the cause for the United States as *amicus curiae.* With him on the brief were *Solicitor General Starr, Acting Assistant Attorney General O'Meara, Ronald J. Mann, Edward J. Shawaker,* and *Anne S. Almy.*

G. *William Rice* argued the cause for respondent. With him on the brief were *Gregory H. Bigler* and *N. Brent Parmer.**

JUSTICE O'CONNOR delivered the opinion of the Court.

In this case, we consider whether the State of Oklahoma may impose income taxes or motor vehicle taxes on the members of the Sac and Fox Nation.

I

The Sac and Fox Nation (Tribe) is a federally recognized Indian tribe located in the State of Oklahoma. Until the mid-18th century, the Tribe lived in the Great Lakes region of the United States. M. Wright, A Guide to the Indian Tribes of Oklahoma 225 (1951). In 1789, it entered into its first treaty with the United States and ceded much of its land. See Treaty at Fort Harmar, 7 Stat. 28. That was only the first of many agreements between the Government and the Tribe in which the Tribe surrendered its land and moved elsewhere. As part of its gradual, treaty-imposed migration, the Tribe stopped briefly along the Mississippi and Missouri Rivers in what are now the States of Illinois, Missouri, Iowa, and Nebraska. Wright, Guide to Indian

---

*A brief of *amici curiae* urging reversal was filed for the State of Arizona et al. by *Grant Woods,* Attorney General of Arizona, and *Patrick Irvine,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Hubert H. Humphrey III* of Minnesota, *Marc Racicot* of Montana, *Nicholas J. Spaeth* of North Dakota, *Paul Van Dam* of Utah, and *James E. Doyle* of Wisconsin.

Briefs of *amici curiae* urging affirmance were filed for the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation et al. by *Reid Peyton Chambers* and *Jeannette Wolfley;* for the Cheyenne-Arapaho Tribes of Oklahoma et al. by *Melody L. McCoy, Bertram E. Hirsch,* and *Thomas W. Fredericks;* for the Choctaw Nation of Oklahoma by *Bob Rabon;* and for the Navajo Nation et al. by *Paul E. Frye, Wayne H. Bladh,* and *Stanley M. Pollack.*

Tribes of Oklahoma, at 225–226. In the mid-19th century, the Sac and Fox Nation ceded land in several States for two reservations in Kansas, but the Government eventually asked it to cede these as well. *Id.*, at 226. In 1867, the Sac and Fox Nation moved for the final time to the Sac and Fox Reservation in Indian Territory. *Ibid.*

By the 1880's, however, white settlers increasingly clamored for the land the Sac and Fox and other tribes held in Indian Territory. In response, Congress passed two statutes that greatly affected the Tribe: the General Allotment Act (Dawes Act), 24 Stat. 388, which provided for allotting reservation land to individual tribal members and purchasing the surplus land for the use of white settlers; and the Oklahoma Territory Organic Act, 26 Stat. 81, which established the Oklahoma Territory in what is now the western half of the State of Oklahoma. This new Oklahoma Territory included the Sac and Fox Nation's Reservation. In June 1890, the Government and the Tribe concluded their final treaty—a treaty designed to effectuate the provisions of the Dawes Act. Congress ratified the treaty in 1891 (hereinafter 1891 Treaty). Concerning the Tribe's cession of land, the 1891 Treaty states:

> "ARTICLE I. The said the Sac and Fox Nation hereby cedes, conveys, transfers, surrenders and forever relinquishes to the United States of America, all their title, claim or interest, of every kind or character, in and to the following described tract of land or country, in the Indian Territory, to-wit: [the Reservation land granted the Tribe in the Treaty of 1867].
>
> ·  ·  ·  ·  ·
>
> "*Provided however* the quarter section of land on which is now located the Sac and Fox Agency shall not pass to the United States by this cession, conveyance, transfer, surrender and relinquishment, but shall remain the property of said Sac and Fox Nation, to the full extent that it is now the property of said Nation—subject

only to the rights of the United States therein, by reason of said Agency being located thereon, and subject to the rights, legal and equitable, of those persons that are now legally located thereon. . . . And the section of land now designated and set apart near the Sac and Fox Agency, for a school and farm, shall not be subject either to allotment to an Indian or to homestead entry under the laws of the United States—but shall remain as it now is and kept for school and farming purposes, so long as said Sac and Fox Nation shall so use the same . . . ." 26 Stat. 750–751.

Under the 1891 Treaty, the Tribe retained the 800 acres discussed in the proviso. Each of the Tribe's members, adults and minors, had the right to choose an allotment of one quarter section (160 acres) within the boundaries of the ceded land.

Today, the Sac and Fox Nation has approximately 2,500 members. Tr. of Oral Arg. 49. It has a fully functioning tribal government with its headquarters on the 800 acres reserved to it under the 1891 Treaty. The United States recognizes and encourages the Tribe's sovereign right to self-governance within "the family of governments in the federal constitutional system." Compact of Self-Governance Between the Sac and Fox Nation and the United States of America 2 (June 26, 1991), see 25 U. S. C. §450f, note. To this end, the Tribe has a Constitution and a Code of Laws, as well as a court system in which to enforce them. It employs approximately 140 to 150 people, most of whom are tribal members. See Tr. of Oral Arg. 50.

Among the Tribe's employees are the members of the Sac and Fox Tax Commission, which administers the Sac & Fox tax code. The Tribe imposes a tribal earnings tax, see Sac & Fox Tribe of Indians of Okla. Code of Laws, Tit. 14, ch. 4, and a motor vehicle tax, see ch. 8. The earnings of any employee employed within tribal jurisdiction, whether or not that employee is a member of the Tribe, are subject

to the earnings tax. Ch. 4, §402. The motor vehicle tax and registration provisions apply to "all motor vehicles owned by a resident of, and principally garaged within the jurisdiction of the Sac and Fox Tribe of Indians of Oklahoma." Ch. 8, §802.

The Oklahoma Tax Commission (Commission) also administers income taxes and motor vehicle taxes and fees. Oklahoma Income Tax Act, Okla. Stat., Tit. 68, §2351 *et seq.* (1981 and Supp. 1990). All residents, and nonresidents of Oklahoma who receive income in the State, are subject to the Oklahoma income tax. §§2362, 2368. Oklahoma contends that the tax applies equally to members of Indian tribes and to nonmembers. Thus, it claims that those residents of Oklahoma who also reside within Sac and Fox jurisdiction are subject to both state and tribal income taxes.

Pursuant to the Vehicle Excise Tax Act, Okla. Stat., Tit. 68, §2101 *et seq.* (1981 and Supp. 1990), the State levies an excise tax, calculated as a percentage of a vehicle's value, "upon the transfer of legal ownership of any vehicle registered in th[e] state and upon the use of any vehicle registered in th[e] state." §2103(A). The Commission collects the tax "at the time of the issuance of a certificate of title for any such vehicle." *Ibid.* Finally, the Commission assesses a vehicle registration fee for all vehicles registered with the State of Oklahoma, see Oklahoma Vehicle License and Registration Act, Okla. Stat., Tit. 47, §1101 *et seq.* (Supp. 1990), at the annual rate of $15 plus a percentage of the value of the car, §1132(A)(1). Like the vehicle excise tax, see Tit. 68, §2102, the vehicle registration fees are to provide funds for "general governmental functions," Tit. 47, §1103.

The Commission contends that tribal members must register their vehicles with the State, just as everyone else who lives within Oklahoma must do. The Tribe, however, requires Sac and Fox tribal members who live and garage cars within Sac and Fox territory to register those cars with the Tribe and to use tribal license plates. Oklahoma considers

all tribal members who register their vehicles with the Sac and Fox Nation (and hence do not pay state excise and registration taxes) to be delinquent with regard to the state taxes. Nevertheless, so long as a tribal member retains ownership of a vehicle, the State makes no effort to collect the allegedly delinquent taxes. If the tribal member sells the car to a nonmember, however, and the nonmember then "applies to the State for a title and license plate, the subsequent owner must bring up the title on the vehicle by paying the current and delinquent excise taxes on the transfers of the vehicle." App. 29. The subsequent owner also must pay registration fees for the current year and registration fees and penalties for one previous year. *Ibid.* In contrast, the Commission issues transfer titles to vehicles previously licensed in other States upon payment of current registration fees without more. Okla. Stat., Tit. 68, § 2105(b) (Supp. 1990).

The Sac and Fox Nation brought this action on behalf of itself and all residents of its territorial jurisdiction, App. 1, seeking a permanent injunction barring the Commission from taxing the income of people who earn their income within Sac and Fox territory and of people who reside within the Tribe's jurisdiction, *id.*, at 8. The Tribe also sought relief from imposition of the State's vehicle excise tax and registration fees on vehicles "owned by residents of, and principally garaged within, the Sac and Fox jurisdiction" that lawfully were registered with the Sac and Fox Nation. *Ibid.* In large part, the Tribe based its arguments of immunity on our opinion in *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164 (1973), in which we held that a State could not subject a tribal member living on the reservation whose income derived from reservation sources to a state income tax absent express authorization from Congress. The Commission contended in response that neither *McClanahan* nor any other of our cases discussing Indian

sovereign immunity were relevant. The analysis in those cases, the Commission argued, applied only to tribes on established reservations. It reasoned that Oklahoma had complete tax jurisdiction over the Sac and Fox, because the 1891 Treaty had disestablished the Sac and Fox Reservation.

The District Court for the Western District of Oklahoma ruled on cross-motions for summary judgment. The court declined to determine whether the reservation had been disestablished or its boundaries diminished. Instead, it held that the Commission could levy and collect state income tax on the income that nonmembers of the Tribe earned from tribal employment on trust lands, but not on the income that tribal members earned from tribal employment on trust lands. App. to Pet. for Cert. A–10. The District Court did not look to where the tribal members resided; it rested its holding instead only on where they worked. The court also held that the Commission could not require, as a prerequisite to issuing an Oklahoma motor vehicle title, payment of excise taxes and registration fees for the years a vehicle properly had been licensed by the Tribe. *Id.*, at A–11 to A–13.

Both parties appealed, and the United States Court of Appeals for the Tenth Circuit affirmed. 967 F. 2d 1425 (1992). Like the District Court, the Court of Appeals declined to determine the boundaries of the Sac and Fox Reservation. The court read our opinion in *McClanahan, supra,* to stand for the proposition that, absent express congressional authorization, state jurisdiction to tax "the income of a tribal member earned solely on a reservation is presumed to be preempted," 967 F. 2d, at 1428, and it rejected the State's contention that the residence of the tribal member also was relevant, *id.*, at 1428, n. 3. Thus, the Court of Appeals looked only to the status of the land on which the income was earned—in this case, trust land. In light of *Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Tribe of Okla.,* 498 U. S. 505 (1991), the court concluded that for tribal immu-

nity purposes there was no difference between trust land validly set apart for Indian use and reservation land. 967 F. 2d, at 1428. Hence, the income of tribal members who worked for the Tribe on trust land was immune from state taxation. *Id.*, at 1428–1429. The income of nonmembers, however, was not immune. *Id.*, at 1429–1430.

Turning to the vehicle taxes, the Court of Appeals found that the excise tax was not enforced as a sales tax. *Id.*, at 1430. It rejected the Commission's contention that the registration fee was imposed for the privilege of using state roads because the State had offered no evidence to show the registration fee was tailored to the amount of use outside Indian country. *Ibid.* Relying on *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U. S. 463 (1976), and *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134 (1980), the court held that the taxes were "flatly prohibited." 967 F. 2d, at 1430. Although the taxes were imposed only indirectly on tribal members, the court would "not permit the State to tax indirectly what it cannot tax directly." *Ibid.* As with the income taxes, the Court of Appeals rejected the Tribe's argument that vehicles registered with the Tribe by nonmembers also should be immune from state taxation. *Id.*, at 1430–1431. Both parties petitioned for certiorari.

Soon after the Court of Appeals issued its opinion, the Wisconsin Supreme Court issued an opinion in which it concluded that *McClanahan*'s presumption in favor of tax immunity was limited to those instances in which a tribal member both lived on and earned a living on the reservation. *Anderson* v. *Wisconsin Dept. of Revenue*, 169 Wis. 2d 255, 484 N. W. 2d 914 (1992). Thus, it declined to find state tax immunity for the wages of a tribal member who worked for the tribe on the reservation but who did not live on the reservation. *Id.*, at 274–276, 484 N. W. 2d, at 921–922. We granted the Oklahoma Tax Commission's petition for certiorari. 506 U. S. 971 (1992).

## II

### A

In *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164 (1973), we held that a State was without jurisdiction to subject a tribal member living on the reservation, and whose income derived from reservation sources, to a state income tax absent an express authorization from Congress. The Commission contends that the *McClanahan* presumption against jurisdiction comes into effect only when the income is earned from reservation sources by a tribal member residing on the reservation. Under the Commission's reading of *McClanahan*, the District Court erred in not determining whether the Sac and Fox Reservation has been disestablished or reduced because unless the members of the Sac and Fox Nation live on a *reservation* the State has jurisdiction to tax their earnings and their vehicles. The Commission is partially correct: The residence of a tribal member is a significant component of the *McClanahan* presumption against state tax jurisdiction. But our cases make clear that a tribal member need not live on a formal reservation to be outside the State's taxing jurisdiction; it is enough that the member live in "Indian country." Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States. See 18 U. S. C. § 1151.

Our decision in *McClanahan* relied heavily on the doctrine of tribal sovereignty. We found a "deeply rooted" policy in our Nation's history of "leaving Indians free from state jurisdiction and control." 411 U. S., at 168 (internal quotation marks omitted). Indian nations, we noted, long have been "'distinct political communities, having territorial boundaries, within which their authority is exclusive.'" *Ibid.* (quoting *Worcester* v. *Georgia*, 6 Pet. 515, 557 (1832) (Marshall, C. J.)). The Indian sovereignty doctrine, which histor-

ically gave state law "no role to play" within a tribe's territorial boundaries, 411 U. S., at 168, did not provide "a definitive resolution of the issues," but it did "provid[e] a backdrop against which the applicable treaties and federal statutes must be read," *id.*, at 172. Accord, *Colville, supra,* at 178–179 (REHNQUIST, J., concurring in part, concurring in result in part, and dissenting in part). Although "exemptions from tax laws should, as a general rule, be clearly expressed," *McClanahan,* 411 U. S., at 176, the tradition of Indian sovereignty requires that the rule be reversed when a State attempts to assert tax jurisdiction over an Indian tribe or tribal members living and working on land set aside for those members.

To determine whether a tribal member is exempt from state income taxes under *McClanahan,* a court first must determine the residence of that tribal member. To the extent that the Court of Appeals ruled without such a reference, it erred. The Commission, however, contends that the relevant boundary for taxing jurisdiction is the perimeter of a formal reservation, not merely land set aside for a tribe or its members. In the Commission's view, Indian sovereignty serves as a "backdrop" only for those tribal members who live on the reservation, and all others fall outside *McClanahan's* presumption against taxation. It is true that we began our discussion in *McClanahan* by emphasizing that we were not "dealing with Indians who have left or never inhabited reservations set aside for their exclusive use or who do not possess the usual accoutrements of tribal self-government." *Id.*, at 167–168. Here, in contrast, some of the Tribe's members may not live within a reservation; indeed, if the Commission's interpretation of the 1891 Treaty is correct and the reservation was disestablished, none do.

Nonetheless, in *Oklahoma Tax Comm'n* v. *Citizen Band of Potawatomi Tribe of Okla.,* we rejected precisely the same argument—and from precisely the same litigant. There the Commission contended that even if the State did not have

jurisdiction to tax cigarette sales to tribal members on the reservation, it had jurisdiction to tax sales by a tribal convenience store located outside the reservation on land held in trust for the Potawatomi. 498 U. S., at 511. We noted that we have never drawn the distinction Oklahoma urged. Instead, we ask only whether the land is Indian country. *Ibid.* Accord, F. Cohen, Handbook of Federal Indian Law 34 (1982 ed.) ("[T]he intent of Congress, as elucidated by [Supreme Court] decisions, was to designate as Indian country all lands set aside by whatever means for the residence of tribal Indians under federal protection, together with trust and restricted Indian allotments"); *Ahboah* v. *Housing Authority of Kiowa Tribe of Indians,* 660 P. 2d 625, 629 (Okla. 1983) (same).

Additional congressional enactments support our conclusion that the *McClanahan* presumption against state taxing authority applies to all Indian country, and not just formal reservations. Under Pub. L. 280, 67 Stat. 588, 28 U. S. C. § 1360 (Pub. L. 280), Congress required some States to assume, and gave other States, including Oklahoma, see *Ahboah, supra,* at 630, the option of assuming, criminal and civil jurisdiction "in the areas of *Indian country* situated within such State." 25 U. S. C. §§ 1321(a), 1322(a) (emphasis added). Congress amended Pub. L. 280 with the Indian Civil Rights Act of 1968, Pub. L. 90–284, 82 Stat. 78–80, and among other changes, added a requirement that the tribes involved consent before a State can assume jurisdiction over Indian country. Oklahoma did not assume jurisdiction pursuant to Pub. L. 280 prior to the law's amendment in 1968, see *Ahboah, supra,* at 630–632, and the Commission does not contend that the members of the Sac and Fox Nation have consented to an assumption of jurisdiction since the amendment. We noted in *McClanahan* that the "absence of either civil or criminal jurisdiction would seem to dispose of" any contention that the State has jurisdiction to tax. 411 U. S., at 178–179.

On remand, it must be determined whether the relevant tribal members live in Indian country—whether the land is within reservation boundaries, on allotted lands, or in dependent communities. If the tribal members do live in Indian country, our cases require the court to analyze the relevant treaties and federal statutes against the backdrop of Indian sovereignty. Unless Congress expressly authorized tax jurisdiction in Indian country, the *McClanahan* presumption counsels against finding such jurisdiction. Because all of the tribal members earning income from the Tribe may live within Indian country, we need not determine whether the Tribe's right to self-governance could operate independently of its territorial jurisdiction to pre-empt the State's ability to tax income earned from work performed for the Tribe itself when the employee does not reside in Indian country. See, *e. g., White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 142 (1980) (citing *Williams* v. *Lee*, 358 U. S. 217, 220 (1959)).

## B

The Commission also argues that the Court of Appeals erred in holding that the State could not impose state motor vehicle taxes on tribal members who live on tribal land, garage their cars principally on tribal land, and register their vehicles with the Tribe. It contends that because the vehicle excise tax is paid only when a vehicle is sold, it "resembles a sales tax" on transactions that occur outside Indian country. Brief for Petitioner 21. It also contends that the registration fee is not pre-empted because it is imposed on all vehicles that use state roads. *Id.*, at 23. The Court of Appeals found that the vehicle excise tax "is not enforced as a sales tax against Sac and Fox purchasers," 967 F. 2d, at 1430, and by its terms, the tax is imposed on both the transfer and the use of any vehicle in the State. Okla. Stat., Tit. 68, § 2103 (Supp. 1990). Furthermore, the taxes are not imposed on *all* vehicles using the roads in Oklahoma. Residents of nearby States pay neither the excise tax nor the

registration fee. See Okla. Stat., Tit. 47, § 1125(C) (Supp. 1990) (exempting "visiting nonresident[s]" from registration and hence from payment of both taxes).

We agree with the Court of Appeals that the excise tax and registration fees strongly resemble the taxes that we held pre-empted in *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134 (1980). Prior to *Colville,* we held in *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation,* 425 U. S. 463 (1976), that Montana could not apply its personal property tax to motor vehicles owned by tribal members who lived on the reservation. *Id.,* at 480–481. To avoid the *Moe* holding, in *Colville* Washington described its motor vehicle taxes as "excise tax[es] for the 'privilege' of using the covered vehicle in the State." *Colville, supra,* at 162. Although Washington called its taxes "excise taxes," those taxes, like the taxes we held pre-empted in *Moe,* were "assessed annually at a certain percentage of fair market value" of the vehicle, and the State sought to impose them "upon vehicles owned by the Tribe or its members and used both on and off the reservation." 447 U. S., at 162. In *Colville,* we rejected Washington's distinction of *Moe* because the only difference between the Washington taxes and the Montana taxes was their names. 447 U. S., at 163. We did "not think *Moe* and *McClanahan* c[ould] be this easily circumvented. While Washington may well be free to levy a tax on the use outside the reservation of Indian-owned vehicles, it may not under that rubric accomplish what *Moe* held was prohibited." *Ibid.*

Oklahoma's taxes are no different than those in *Moe* and *Colville.* Like the taxes in both those cases, the excise tax and registration fee are imposed in addition to a sales tax; the two taxes are imposed for use both on and off Indian country; and the registration fees are assessed annually based on a percentage of the value of the vehicle. Oklahoma may not avoid our precedent by avoiding the name "personal

property tax" here any more than Washington could in *Colville*.

The Commission, however, argues that Oklahoma's taxes are different for yet another reason. It claims that because the Sac and Fox live on scattered allotments, and not on a reservation, neither *Moe* nor *Colville* applies. That argument fails for the same reasons it fails with regard to income taxes. See *supra*, at 123–126. Tribal members who live in Indian country consisting solely of scattered allotments likely use their cars more frequently on state land and less frequently within Indian country than tribal members who live on an established reservation. Nevertheless, members of the Sac and Fox Nation undeniably use their vehicles within Indian country. As we said in *Colville*, had the State "tailored its tax to the amount of actual off-[Indian country] use, or otherwise varied something more than mere nomenclature, this might be a different case. But it has not done so, and we decline to treat the case as if it had." 447 U. S., at 163–164.

### III

Absent explicit congressional direction to the contrary, we presume against a State's having the jurisdiction to tax within Indian country, whether the particular territory consists of a formal or informal reservation, allotted lands, or dependent Indian communities. Because the Court of Appeals did not determine whether the tribal members on whom Oklahoma attempts to impose its income and motor vehicle taxes live in Indian country, its judgment is vacated. We remand this case for further proceedings consistent with this opinion.

*It is so ordered.*