1999-NMCA-050

977 P.2d 1021

**RAMAH NAVAJO SCHOOL BOARD, INC., a Navajo Tribal Organization and School Board, Patterson Oil Co., Inc., a New Mexico for profit corporation; and Gunderson Oil Co., Inc., a New Mexico for profit corporation, Plaintiffs–Appellants,**

v.

**NEW MEXICO TAXATION & REVENUE DEPARTMENT, a State Agency; and John Chavez, individually and as Secretary of the New Mexico Taxation & Revenue Department, Defendants–Appellees.**

No. 18909.

Court of Appeals of New Mexico.

March 4, 1999.

Certiorari Denied, Nos. 25,667, 25,671, April 8 and April 12, 1999.

Michael P. Gross, Law Offices of Michael P. Gross, Santa Fe, for Appellants.

Patricia A. Madrid, Attorney General, Frank D. Katz, Special Assistant Attorney General, Santa Fe, for Appellees.

## OPINION

HARTZ, Judge.

{1} Few areas of the law generate as much controversy, complexity, and confusion as the scope of a state's power to impose taxes that impact Native Americans. Although the United States Supreme Court has written repeatedly on the subject—indeed, one of the leading cases involves the very parties before us in this case—no case decided by that Court is factually on all fours with this case, and it is difficult to determine which factual distinctions are of legal consequence.

{2} Ramah Navajo School Board, Inc. (the Board) is a Navajo tribal governmental entity which operates programs under the Indian Self–Determination and Education Assistance Act of 1975 (the Self–Determination Act), 25 U.S.C. §§ 450–58 (1998). Gunderson Oil Company, Inc., and Patterson Oil Company, Inc., are gasoline distributors which obtained gasoline from a non-Indian refinery off tribal lands in New Mexico and then delivered the gasoline to the Board on the Navajo reservation. The Board complains of two gasoline taxes assessed against Patterson and Gunderson and passed on to the Board. First, the Gasoline Tax Act, NMSA 1978, §§ 7–13–1 to –18 (1971, as amended through 1998), imposes a tax "[f]or the privilege of receiving gasoline" in New Mexico. NMSA 1978, § 7–13–3(A) (1995). Gasoline is "received" when a distributor takes delivery of the gasoline at a refinery or pipeline terminal. See NMSA 1978, § 7–13–2(N)(1)(b) (1993). Second, the Petroleum Products Loading Fee Act (the Loading Fee Act), NMSA 1978, §§ 7–13A–1 to –6 (1990, as amended through 1997), imposes a tax on distributors "[f]or the privilege of loading gasoline ... from a rack at a refinery or pipeline terminal in this state into a cargo tank." NMSA 1978, § 7–13A–3(A) (1990). The taxes were assessed for the audit period

1993–95. During that period the Gasoline Tax Act provided a deduction for "gasoline received in New Mexico sold to the United States or any agency or instrumentality thereof for the exclusive use of the United States or any agency or instrumentality thereof." NMSA 1978, § 7–13–4(B) (1991). Similarly, the Loading Fee Act provided an exemption for such sales. *See* NMSA 1978, § 7–13A–4(B) (1991). There was no similar deduction or exemption for sales to tribal entities, although the Gasoline Tax Act has since been amended to provide a deduction for those sales. *See* NMSA 1978, § 7–13–4(C) (1998).

{3} We hold that the fact that the economic burden of the taxes is ultimately borne by an Indian entity acting pursuant to the Self–Determination Act is not in itself sufficient to render the taxes preempted by the Act. Nevertheless, we hold that the taxes are preempted, at least in part, by the Act because the New Mexico statutes would not impose the taxes if the gasoline were ultimately sold to a federal agency performing the same services as the Board. The purpose of the Act is to encourage Indian entities to assume duties that would otherwise be performed by federal agencies. In particular, the Act mandates that the Indian entity should receive as much federal funding for performing the services as the federal agency would receive. The gasoline taxes undermine the Act to the extent that the Indian entity must bear the economic burden of taxes that would not be imposed if the services were performed by a federal agency.

## I. BACKGROUND

{4} The origins of the Board are set forth by the United States Supreme Court in *Ramah Navajo School Board, Inc. v. Bureau of Revenue*, 458 U.S. 832, 834–35, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982) (*Ramah I*). The Board operates the country's first independent Indian school in modern times. Until 1968 Ramah Navajo children had attended a public high school near the reservation. Then the State of New Mexico closed the facility, leaving the children with the alternatives of either foregoing a high school education or attending distant federal Indian boarding schools. In response the Ramah Navajo Chapter established its own school

board in 1970 and organized the Ramah Navajo School Board, Inc. Funded by the Tribe and the federal government, the Board reopened the school in the abandoned state facility. In 1972 the Board obtained federal funds to design and build a new school on the reservation.

{5} In the late 1980s the Board began the practice that generated the taxes in question. The Board installed gasoline storage tanks on its premises within the reservation and began to buy gasoline in bulk directly from distributors. In a typical transaction the Board would solicit bids from local distributors and receive bids the same day. It would then issue a purchase order for delivery of the gasoline to its storage tanks. The successful bidder would load the Board's order into a tanker truck at a nearby refinery and deliver the gasoline to the Board's tanks within twenty-four hours. About 28 percent of the gasoline purchased was used by the Board in its own vehicles or vehicles leased from the federal government. About 68 percent was sold at a discount to Board employees.

{6} Prior to 1993 the Gasoline Tax Act provided: "Any person paying the gasoline excise tax who in turn sells such gasoline to another, whether or not for use, shall include the tax as part of the selling price of the gasoline." NMSA 1978, § 7–13–3(C) (Repl. Pamp.1990). Perhaps on the assumption that the legal incidence of the tax fell on the Board, the Taxation and Revenue Department (the Department) made no effort to collect the tax on gasoline delivered to the Board's storage tanks on the reservation. In 1993, however, the Act was amended by deleting the requirement that the tax be passed on as part of the selling price of the gasoline. It thus became clear that the legal incidence of the tax fell on the distributor upon receipt of the gas. The Department contends in its answer brief that imposing the tax at the distributor level reduces the number of taxpayers who report and pay the tax and also "ensures that all gasoline sold for use on New Mexico roads is subjected to gasoline tax."

{7} The tax set by the Loading Fee Act is also imposed on the distributor upon re-

ceipt of gasoline. The tax was first enacted in 1990. The record and briefs do not explain why the tax was not assessed against Patterson and Gunderson before 1993 with respect to gasoline to be delivered to the Board. In any event, this tax apparently constitutes only a small portion of the total assessment.

{8} After an audit the Department assessed Patterson and Gunderson for taxes on gasoline sold to the Board. Gunderson paid the assessment, obtained reimbursement from the Board, and assigned to the Board its fight to any refund. Patterson did not pay its assessment, but the Board made the payment and received an assignment of Patterson's rights to any refund.

{9} The Board then filed with the Department a claim for a refund. When the claim was denied, the Board sued in Santa Fe County District Court. Its amended complaint claimed that the tax was preempted by the Self–Determination Act, that the Board was owed a refund, and that it was entitled to declaratory and injunctive relief for violation of civil rights under 42 U.S.C. § 1983 (1998), as well as attorney fees under the companion statute, 42 U.S.C. § 1988 (1998). The Department filed a motion to dismiss the counts alleging causes of action under § 1983, and the motion was granted. The Board and the Department then both filed motions for summary judgment. The district court granted the Department's motion on September 24, 1997. On appeal the Board challenges the dismissal of the § 1983 claims, the grant of the Department's motion for summary judgment, and the failure to grant the Board's summary judgment motion. We affirm the dismissal of the § 1983 claims. With respect to the refund claim, we set aside the summary judgment in favor of the Department and remand to the district court with instructions to order refund of the taxes on gasoline used by the Board and to conduct further proceedings regarding whether to order a refund of the taxes on gasoline sold to Board employees.

## II. *SECTION 1983 CLAIMS*

{10} Section 1983 provides a cause of action against any "person" acting under color of state law who deprives the plaintiff of a right guaranteed by federal law. *See Carter*

*v. City of Las Cruces,* 121 N.M. 580, 582, 915 P.2d 336, 338 (Ct.App.1996). The Board contends that the Department violated federal law by imposing on Patterson and Gunderson the taxes that were passed on to the Board. In the next section of this opinion we will address the merits of that contention. The dismissal of the § 1983 claims, however, was not based on the legality of the taxes. Even if the taxes violated federal law, the § 1983 claims could not be pursued.

{11} To begin with, a claim for damages (a refund of the tax) under § 1983 could not be pursued because only a "person" is liable under the statute. The word "person" in § 1983 does not include a state agency, nor does it include a state official sued for damages in his official capacity. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Board does not contest this point.

{12} Moreover, even though ordinarily state officials can be sued under § 1983 for injunctive or declaratory relief, *see id.* at 71 n. 10, 109 S.Ct. 2304, the United States Supreme Court held in *National Private Truck Council, Inc. v. Oklahoma Tax Commission,* 515 U.S. 582, 115 S.Ct. 2351, 132 L.Ed.2d 509 (1995), that a § 1983 action for injunctive or declaratory relief (and an accompanying claim for attorney fees under § 1988) will not lie with respect to imposition of a state tax if the state provides an adequate remedy at law. The district court here correctly ruled that NMSA 1978, Section 7–1–26 (1997) of the New Mexico Tax Administration Act, NMSA 1978, §§ 7–1–1 to –82 (1965, as amended through 1998), provides that adequate remedy. Section 7–1–26 authorizes filing of a claim for refund with the Department, filing a district court action if the claim is denied, and appealing an adverse district court decision.

{13} The Board raises three arguments why *National Private* should not apply. First, it contends that New Mexico does not provide an adequate remedy at law for challenging the taxes at issue. It points out that the Tax Administration Act does not permit it to challenge the tax because it is not a "taxpayer" under the Act. *See* NMSA

1978, § 7–1–3(V) (1997) (defining taxpayer). And it contends that the taxpayers subject to the tax in question—Patterson and Gunderson—lack standing to claim that the taxes are preempted by the Self–Determination Act because they are not tribes or tribal organizations covered by that Act.

{14} We disagree with this last contention and therefore reject the argument. Under the Tax Administration Act, Patterson and Gunderson have standing to challenge the taxes imposed upon them on any ground, including preemption under the Self–Determination Act. Standing under the Tax Administration Act is a matter of state law, and New Mexico has been generous in recognizing standing. *See New Mexico Right to Choose v. Johnson*, 1999–NMSC–005, ¶¶ 11–14, — N.M. —, 975 P.2d 841; *Doe v. Roman Catholic Church*, 1996–NMCA–094, ¶¶ 16–39, 122 N.M. 307, 924 P.2d 273. New Mexico appellate courts have repeatedly considered claims by non-Indian entities that taxes were preempted by federal law relating to Indians, although the issue of standing was not addressed in the decisions. *See Blaze Const. Co. v. Taxation & Revenue Dep't*, 118 N.M. 647, 884 P.2d 803 (1994); *Rodey, Dickason, Sloan, Akin & Robb, P.A. v. Revenue Div.*, 107 N.M. 399, 759 P.2d 186 (1988).

{15} We hold that taxpayers have standing under the Tax Administration Act to contest the constitutionality of taxes assessed against them. Patterson and Gunderson could thus argue preemption under the Self–Determination Act. When their claims were assigned to the Board, the Board thereby acquired the right to challenge the taxes on preemption grounds. Thus, the State has provided an adequate remedy at law for challenging the taxes in question.

{16} Second, the Board claims to come within an exception to the general rule set forth in *National Private*. A state procedure can be considered "inadequate," so that declaratory and injunctive relief under § 1983 would be appropriate, if the state engages in a repeated course of unconstitutional conduct after an adverse ruling. *National Private*, 515 U.S. at 591 n. 6, 115 S.Ct. 2351, described the exception as follows: "[I]f a state court awards a refund to a taxpayer on the ground that the tax violates the Federal Constitution, but state tax authorities continue to impose the unconstitutional tax, injunctive and declaratory relief might then be appropriate. In such circumstances, the remedy might be thought to be 'inadequate.'" This exception is inapplicable to the case before us. Prior to our decision today, no refund of the taxes at issue has been awarded by any court. Although the Board's amended complaint alleges that the State has continued to impose a tax that had been previously ruled unconstitutional, the allegation is based on the contention that the gasoline taxes at issue here are essentially identical to the gross receipts tax overturned in *Ramah I*. The *Ramah I* tax was a gross receipts tax imposed on a contractor building a school on the reservation under a contract with the Board. *See Ramah I*, 458 U.S. at 835, 102 S.Ct. 3394. There is no allegation that the State has continued to impose the gross receipts tax improperly. Although the ruling in *Ramah I* is certainly relevant to our decision today, the taxes involved then and now are sufficiently distinct that the criteria for the *National Private* exception have not been satisfied. *National Private* permits injunctive or declaratory relief under § 1983 when "tax authorities continue to impose the unconstitutional tax." 515 U.S. at 591 n. 6, 115 S.Ct. 2351. (emphasis added). Because the State has not continued to impose the tax nullified by *Ramah I*, the general rule in *National Private* applies, thus barring a § 1983 claim.

{17} The Board's third argument is ingenious, but too much of a stretch. It states: "[P]roperly viewed, [the Board's] claim is not a claim for a refund of taxes at all but one for damages akin to tort damages for breach of a duty not to interfere in [the Board's] federally-sanctioned activities." We disagree with this characterization of the claim. The claim is a pure-and-simple claim for a refund. Moreover, the policy behind the rule in *National Private* applies regardless of the characterization. That policy is to avoid judicial interference with tax collection outside the specific state statutory machinery for handling tax disputes, at least so long as that machinery provides an "adequate" remedy. *See id.* at 586–87, 589, 115 S.Ct. 2351.

{18} Finally, we reject the Board's suggestion that *Ramah Navajo School Board, Inc., v. Bureau of Revenue*, 104 N.M. 302, 720 P.2d 1243 (Ct.App.1986) (*Ramah II* ), supports a cause of action under § 1983 in this case. Although that decision affirmed an award of attorney fees under § 1988 in a tax challenge, the decision predated *National Private*.

{19} Thus, we follow the general rule set forth in *National Private* and affirm the dismissal of the § 1983 claims.

### III. *PREEMPTION UNDER THE SELF–DETERMINATION ACT*

{20} What we have before us, then, is judicial review under the Tax Administration Act of the Board's claim for a refund. The predicate for that claim is that imposition of the taxes in the specific circumstances presented is preempted by the Self–Determination Act.

{21} The United States Supreme Court has applied a different standard of preemption to federal statutes regulating Indian tribes than it has to other federal laws. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). This difference is justified largely by the "unique historical origins of tribal sovereignty." *Id.* "The Indian sovereignty doctrine ... provides a backdrop against which the applicable treaties and federal statutes must be read." *McClanahan v. State Tax Comm'n*, 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Therefore, we begin our discussion with a brief treatment of tribal sovereignty.

#### A. *The Backdrop of Tribal Sovereignty*

{22} Long before the arrival of European settlers, the tribes were independent, sovereign nations. *See Worcester v. Georgia*, 31 U.S. 515, 542–43, 6 Pet. 515, 8 L.Ed. 483 (1832); Raymond Cross, *Sovereign Bargains, Indian Takings, and the Preservation of Indian Country in the Twenty–First Century*, 40 Ariz.L.Rev. 425, 426–27 (1998). In their conquest and settlement of this country, European governments, followed by our own government, entered into treaties with the tribes. These treaties recognized the special status of tribes and their dominion over specified territory. More than a century ago the United States Supreme Court stated that the tribes

> always have been ... regarded as having a semi-independent position when they preserved their tribal relations; not as states, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the state within whose limits they resided.

*United States v. Kagama*, 118 U.S. 375, 381–82, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). The Supreme Court reaffirmed that view in 1980, *see Bracker*, 448 U.S. at 142, 100 S.Ct. 2578, and earlier this decade it expressed the proposition as follows: "Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (internal quotation marks omitted). As a result, " '[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.' " *McClanahan*, 411 U.S. at 168, 93 S.Ct. 1257 (quoting *Rice v. Olson*, 324 U.S. 786, 789, 65 S.Ct. 989, 89 L.Ed. 1367 (1945)).

{23} In the area of taxation, Indian sovereignty doctrine forbids "taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) (*Jones* ); *see Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (prohibiting state tax imposed on tribe for motor fuels sold by tribe in Indian country). There are, however, limits to tribal sovereignty. Tribes are not exempt from all state taxes, and reservations are not impenetrable havens from state taxation. For example, a state may tax tribal activities outside the reservation, *see Jones*, 411 U.S. at 157–58, 93 S.Ct. 1267 (gross receipts tax on sales by tribal ski resort), and may impose a severance tax on natural resources extracted from Indian reservations by non-Indian lessees, *see Cotton Petroleum Corp. v. New Mexico*,

490 U.S. 163, 186–87, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989).

### B. *The Preemption–by–Implication Doctrine*

{24} Given the longstanding policy of protecting Indian tribes from incursions by the states, federal statutes that regulate tribes have been interpreted expansively to preempt state laws that burden the aims of the federal statutes. In particular, "[a]mbiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *Bracker*, 448 U.S. at 143–44, 100 S.Ct. 2578. The Supreme Court has "rejected a narrow focus on congressional intent to preempt State law as the sole touchstone [and has] also rejected the proposition that preemption requires an express congressional statement to that effect." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983) (*Mescalero*) (internal quotation marks omitted). In applying this special preemption standard the Court has "examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence." *Bracker*, 448 U.S. at 144–45, 100 S.Ct. 2578. The examination calls "for a particularized inquiry into the nature of the state, federal, and tribal interests at stake." *Id.* at 145, 100 S.Ct. 2578. "State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *Mescalero*, 462 U.S. at 334, 103 S.Ct. 2378. The New Mexico Supreme Court has referred to this special preemption standard as the "federal preemption by implication doctrine." *Rodey*, 107 N.M. at 400, 759 P.2d at 187.

{25} Illustrative of this doctrine is the decision by the United States Supreme Court resolving a dispute between the same parties before us in this case. In *Ramah I* the Court held that federal law preempted a New Mexico gross receipts tax imposed on a construction company's receipts from the Board for construction of a school on the reservation. Preemption was found in the "comprehensive and pervasive" federal regulation of the construction and financing of Indian schools. *See Ramah I*, 458 U.S. at 839, 102 S.Ct. 3394. Of particular importance was the codification in the Self–Determination Act of federal policy "encouraging the development of Indian-controlled institutions on the reservation." *Id.* at 840, 102 S.Ct. 3394. The Court quoted the congressional recognition in 25 U.S.C. § 450(b)(3) that " 'parental and community control of the educational process is of crucial importance to the Indian people.' " *Ramah I*, 458 U.S. at 840, 102 S.Ct. 3394. Under the Self–Determination Act the Secretary of the Interior had "promulgated detailed and comprehensive regulations respecting 'school construction for previously private schools now controlled and operated by tribes or tribally approved Indian organizations.' " *Id.* at 840–41, 102 S.Ct. 3394 (quoting 25 C.F.R. § 274.1 (1981)). The Court then concluded:

> The direction and supervision provided by the Federal Government for the construction of Indian schools leave no room for the additional burden sought to be imposed by the State through its taxation of the gross receipts paid to [the contractor] by the Board. This burden, although nominally falling on the non-Indian contractor, necessarily impedes the clearly expressed federal interest in promoting the "quality and quantity" of educational opportunities for Indians by depleting the funds available for the construction of Indian schools.

*Id.* at 841–42, 102 S.Ct. 3394.

{26} The history of the Ramah school also influenced the Supreme Court. In light of the State's abandonment of the Indian children, the Supreme Court said that the State could not justify the tax as being imposed "in return for the governmental functions it provides to those who must bear the burden of paying this tax." *Id.* at 843, 102 S.Ct. 3394. The Court also held that the services provided by the State to the contractor for the contractor's off-reservation activities was "not a legitimate justification for a tax whose ultimate burden falls on the tribal organization." *Id.* at 844, 102 S.Ct. 3394.

The Court noted that the gross receipts tax was imposed "to compensate the State for granting 'the privilege of engaging in business[,]' N.M.Stat.Ann. §§ 7–9–3(F) and 7–9–4(A) (1980)," yet "the 'privilege of doing business' on an Indian reservation is exclusively bestowed by the Federal Government," not the State. *Id.* Finally, the State's "general desire to increase revenues" was "insufficient to justify the additional burdens imposed by the tax on the comprehensive federal scheme regulating the creation and maintenance of educational opportunities for Indian children and on the express federal policy of encouraging Indian self-sufficiency in the area of education." *Id.* at 845, 102 S.Ct. 3394.

▮ {27} Given this sweeping language in *Ramah I*, the Board naturally contends that the gasoline taxes here are preempted for the same reason. In the Board's view the essential elements of *Ramah I* were that the State was supplying no services to the school and the economic burden of the tax fell on the Board. Those features are likewise present with respect to the gasoline taxes involved in this case. In addition, the Board contends that the gasoline taxes here are indistinguishable in substance from the tax in *Ramah I*. Although the tax·is imposed on the receipt of gasoline from the refinery by the distributor, Patterson or Gunderson, the Board argues that the purchase transaction should be looked at as a whole. From that perspective, it says, the tax is really being imposed on the delivery of the gasoline to the Board on the reservation. The tax in *Ramah I* was likewise imposed on an on-reservation transaction.

{28} Though the Board's argument is not without force, we must reject it. In *Rodey*, 107 N.M. at 400, 759 P.2d at 187, the New Mexico Supreme Court ruled that the preemption-by-implication doctrine does not apply to taxes imposed on non-Indians outside the reservation. In that circumstance, according to *Rodey*, there is no need to balance federal, state, and tribal interests. In particular, the economic burden of the tax is of no consequence. A tax is preempted only if there is "an actual conflict with an express federal provision." *Id.* at 402, 759 P.2d at 189.

{29} Following *Rodey*, we are not required by *Ramah I* to find the taxes here to be preempted. The tax at issue in *Ramah I* was imposed on a transaction on the reservation, so the preemption-by-implication doctrine applied. In contrast, the taxes in this case were imposed on the receipt of gasoline by non-Indians *outside the reservation*, so the doctrine is inapplicable.

{30} The Board argues vigorously that although the result in *Rodey* may be correct, the opinion erred in stating that the preemption-by-implication doctrine can never apply to a tax whose legal incidence falls on a non-Indian for an off-reservation transaction. It claims that *Rodey* is contrary to decisions by the United States Supreme Court and that on matters of federal law we must follow the United States Supreme Court, not the New Mexico Supreme Court.

▮ {31} As a subordinate court, however, we must follow precedents of our state Supreme Court. *See State v. Manzanares*, 100 N.M. 621, 622, 674 P.2d 511, 512 (1983). In recent years we have been willing to predict that our Supreme Court would not follow one of its own precedents, but only when legal developments or scholarship strongly suggest the likelihood of such a reversal. *See, e.g., State ex rel. Martinez v. City of Las Vegas*, 118 N.M. 257, 259, 880 P.2d 868, 870 (Ct.App.1994); *cf. Cheesecake Factory, Inc. v. Baines*, 1998–NMCA–120, ¶ 17, 125 N.M. 622, 964 P.2d 183 (declining to rely on Supreme Court precedent that would likely be overruled). Those factors are not present here.

{32} The principal reasons that persuaded the *Rodey* Court still obtain. First, *Rodey* noted that the United States Supreme Court had never held that an off-reservation tax on non-Indians was preempted. *See Rodey*, 107 N.M. at 402, 759 P.2d at 189. That is still true.

{33} Second, *Rodey* relied on language by the United States Supreme Court emphasizing state authority over off-reservation activity by tribes themselves. In particular, *Rodey* noted the statement in *Jones* that "Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state laws." *Rodey*, 107 N.M. at 402, 759 P.2d at 189 (quoting *Jones*, 411 U.S. at 148, 93 S.Ct. 1267); *see also*

*Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 162, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (state power over Indian affairs is considerably more expansive off the reservation). In our view, the United States Supreme Court has not indicated any shift in this regard since our Supreme Court's decision in *Rodey.*

{34} We address, however, the Board's arguments that two more recent decisions of the United States Supreme Court undermine what was said in *Rodey,* at least in the context of this case. Those decisions are *Oklahoma Tax Commission v. Sac & Fox Nation,* 508 U.S. 114, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993), and *Chickasaw.*

{35} In *Sac & Fox,* 508 U.S. at 126–28, 113 S.Ct. 1985, the Supreme Court struck down an Oklahoma tax on motor vehicles owned by members of the Sac and Fox Nation who lived and garaged their vehicles on the reservation. Although the tax was called an excise tax and the state argued that it resembled a sales tax—imposed on sales off the reservation—the Supreme Court looked behind the label. Various features of the tax convinced the Court that in essence the tax was a personal property tax imposed on Indian property located on the reservation. Changing the label of the tax made no legal difference.

{36} The Board contends that New Mexico is trying to do what Oklahoma was prohibited from doing in *Sac & Fox.* Prior to 1993 the Gasoline Tax Act required distributors to pass the tax on to purchasers of the gasoline. *See* § 7–13–3(C) (Repl.Pamp.1990). In 1993 the Act was amended to delete that requirement, thereby making clear that the legal incidence of the tax falls on the distributor upon receipt of gasoline from the refinery. After the amendment the Department apparently felt free to assess the tax on gasoline ultimately destined for the Board's on-reservation storage tanks. According to the Board, the amendment changed nothing in substance, but was merely a maneuver to try to avoid preemption of the tax by the Self–Determination Act, just the sort of evasion foreclosed by *Sac & Fox.*

{37} But there is a difference between changing the label of a tax, as in *Sac & Fox,* and changing the legal incidence of the tax, as was done here. This is apparent from the Supreme Court's opinion in *Chickasaw.* The opinion addressed a motor fuels excise tax imposed on fuel sold—to Indians and non-Indians—by tribal retail stores on tribal trust land. *See Chickasaw,* 515 U.S. at 452–54, 115 S.Ct. 2214. The Supreme Court held the tax unlawful because the legal incidence of the tax fell on the tribal retailer. The Court added, however: "[I]f a State is unable to enforce a tax because the legal incidence of the impost is on Indians or Indian Tribes, the State generally is free to amend its law to shift the tax's legal incidence. So, in this case, the State recognizes and the Tribe agrees that Oklahoma could accomplish what it here seeks 'by declaring the tax to fall on the consumer and directing the Tribe to collect and remit the levy.' " *Id.* at 460, 115 S.Ct. 2214 (quoting petition for certiorari). Clearly, changing the legal incidence of a tax can have legal consequences; in particular, it can be a means of avoiding preemption.

{38} Undaunted, the Board argues that *Chickasaw* actually supports its view. It reads *Chickasaw* as holding only that the legal incidence of a tax is determinative when the legal incidence falls on the tribe. Otherwise, according to the Board, one applies the balancing test of the preemption-by-implication doctrine. It contends that the Supreme Court was only uttering dictum when it said that Oklahoma could accomplish its purpose by changing the legal incidence of its tax. It also suggests that the Court would give effect to removing the legal incidence from the tribe and imposing it on the non-Indian only if the economic burden of the tax already fell on the non-Indian, as was the case with respect to the gasoline tax in *Chickasaw,* which was imposed on tribal sales to non-Indians. If the Board's interpretation of *Chickasaw* is correct, then the preemption-by-implication doctrine applies to the gasoline taxes here, because their economic burden clearly falls on the Board.

{39} We disagree with the Board's interpretation of *Chickasaw.* Only one sentence in the opinion could be read as supporting the Board. The opinion states: "[I]f the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement

of the tax; if the balance of federal, state, and tribal interests favors the State, and federal law is not to the contrary, the State may impose its levy." *Chickasaw*, 515 U.S. at 459, 115 S.Ct. 2214. From this language, one might infer that if the legal incidence of the tax falls on an Indian or Indian tribe, the tax is always barred; but if it falls on a non-Indian, the standards of the preemption-by-implication doctrine—which balances federal, state, and tribal interests—apply, regardless of whether the taxed transaction occurs on the reservation. In other words, the balancing test applies off as well as on the reservation. Perhaps this is a proper inference, but we think not.

{40} The quoted sentence from *Chickasaw* must be read in conjunction with the preceding portion of the paragraph. The full passage states:

> The initial and frequently dispositive question in Indian tax cases, therefore, is who bears the legal incidence of a tax. If the legal incidence of an excise tax rests on a tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization. But if the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax; if the balance of federal, state, and tribal interests favors the State, and federal law is not to the contrary, the State may impose its levy[.]

*Id.* at 458–59, 115 S.Ct. 2214 (citation omitted). As we read the passage, when the opinion mentions the balancing test, the Supreme Court was considering only sales in Indian country, not all sales everywhere. Although that limitation is not expressly noted in the sentence relied on by the Board, the limitation is implicit and, in our view, clear. If the Court were considering off-reservation taxes, one would expect the opinion to have qualified the assertion that a state cannot enforce a tax whose legal incidence falls on a tribe, by noting that such taxes can be proper off the reservation. *See Jones*, 411 U.S. at 157–58, 93 S.Ct. 1267 (upholding state gross receipts tax on sales by tribe at off-reservation ski resort). The one case cited by the Court in support of the last sentence of the above quote was *Colville*, 447 U.S. at 154–57, 100 S.Ct. 2069, which concerned a tax imposed on economic activity within Indian country. Moreover, throughout the *Chickasaw* opinion the Court sets Indian country as the context of its analysis. *See Chickasaw*, 515 U.S. at 458–60, 115 S.Ct. 2214. This week's opinion in *Arizona Department of Revenue v. Blaze Construction Co.*, 526 U.S. 32, 119 S.Ct. 957, 143 L.Ed.2d 27 (1999), confirms our reading of *Chickasaw*. In *Blaze* the United States Supreme Court states that it has applied the balancing test "[i]n cases involving taxation of on-reservation activity ... where the legal incidence of the tax fell on a nontribal entity engaged in a transaction with tribes or tribal members." *Id.* 119 S.Ct. at 960.

{41} In short, we find nothing in *Sac & Fox* or *Chickasaw* that would call into question the view set forth in *Rodey*. On the contrary, *Chickasaw* could be read as supporting a bright-line test such as that in *Rodey*. In the following passage the United States Supreme Court explains the practical virtues of looking to the legal incidence of a tax, rather than its economic impact, in deciding whether it is preempted.

> Judicial focus on legal incidence in lieu of a more venturesome approach accords due deference to the lead role of Congress in evaluating state taxation as it bears on Indian tribes and tribal members. The State complains, however, that the legal incidence of a tax has no relationship to economic realities. But our focus on a tax's legal incidence accommodates the reality that tax administration requires predictability. The factors that would enter into an inquiry of the kind the State urges are daunting. If we were to make economic reality our guide, we might be obliged to consider, for example, how completely retailers can pass along tax increases without sacrificing sales volume—a complicated matter dependent on the characteristics of the market for the relevant product.
>
> By contrast, a "legal incidence" test, as 11 States with large Indian populations have informed us, "provide[s] a reasonably bright-line standard which, from a tax administration perspective, responds to the need for substantial certainty as to the permissible scope of state taxation authori-

ty." Brief for South Dakota et al. as *Amici Curiae* 2.

*Chickasaw,* 515 U.S. at 459–60, 115 S.Ct. 2214 (internal quotation marks and citations omitted from first paragraph). *Chickasaw* recognized a bright-line test to preempt a tax whose legal incidence falls on a tribal entity for on-reservation activity. Although the opinion does not expressly say that a bright-line test based on a tax's legal incidence is to be applied for determining whether an *off-reservation* tax is preempted, the rationale of *Chickasaw* certainly supports that approach.

{42} Finally, we disagree with the Board that, regardless of general doctrine, the United States Supreme Court decision in *Ramah I* itself requires us to hold that the taxes at issue here are preempted. We recognize that the *Ramah I* opinion expresses a dim view of the State's imposing a tax whose economic burden is borne by the Board, when the State has abandoned its role in educating the Navajo children in the Ramah district. Nevertheless, *Ramah I* itself rested, at least in part, on the fact that the tax was imposed on activities occurring within the reservation. The opinion noted that the New Mexico gross receipts tax was imposed on "the privilege of engaging in business" and yet "New Mexico has not explained the source of its power to levy such a tax ... where the privilege of doing business on an Indian reservation is exclusively bestowed by the Federal Government." *Id.* at 844, 102 S.Ct. 3394 (internal quotation marks and citations omitted). The gasoline taxes, in contrast, are imposed "[f]or the privilege of receiving gasoline in this state," § 7–13–3(A), and "[f]or the privilege of loading gasoline ... from a rack at a refinery or a pipeline terminal in this state," § 7–13A–3(A); and in this case all such receiving and loading occurred off the reservation, *see* § 7–13–2(N) (definition of "received" in Gasoline Tax Act). Unlike the situation in *Ramah I,* the tax is imposed on an off-reservation transaction.

{43} In short, following *Rodey,* and in line with our understanding of recent United States Supreme Court decisions, we hold that the preemption-by-implication doctrine does not apply to a tax whose legal incidence is upon a non-Indian for off-reservation activity. Hence, that doctrine does

not require preemption of the taxes in this case.

{44} That is not to say, however, that the taxes are not preempted by the Self–Determination Act. Even if the special preemption-by-implication doctrine does not apply, preemption may be appropriate under more general standards. We now turn to that issue.

### C. *General Preemption Doctrine*

{45} Unlike the standard applied under the preemption-by-implication doctrine, the general rule is that "broad and abstract federal goals [are] given scant preemptive effect." Laurence H. Tribe, *American Constitutional Law* § 6–26, at 489 (2d ed.1988). State action is not preempted "where the most that can be said is that the direction in which state law pushes someone's actions is in general tension with broad or abstract goals that may be attributed to various federal laws or programs." *Id.* at 487.

{46} But a court should find that state law is preempted "if it specifically frustrates fairly narrow and concrete objectives that underlie federal enactments." *Id.* (footnote omitted). "[S]tate action must ordinarily be invalidated if its effect is to discourage conduct that federal action specifically seeks to encourage." *Id.* at 482–83. In our view, that is the situation here. We hold that specific provisions of the Self–Determination Act preempt state taxes that make it more costly for the Board to perform services than it would be for federal agencies to perform the same services. Consequently, the taxes at issue in this case are preempted by the Self–Determination Act to the extent that the gasoline was sold to the Board for its exclusive use. As previously noted, the state statutes provided that the gasoline taxes would not have been owed in this case if the gasoline had been for the exclusive use of an agency or instrumentality of the United States.

{47} Before turning to the pertinent provisions of New Mexico's tax laws and the Self–Determination Act, we quickly dispose of an argument by the Department. The

Department contends that a footnote in *Cotton Petroleum*, 490 U.S. at 183 n. 14, 109 S.Ct. 1698, asserts that the Self–Determination Act can never preempt a state tax. We disagree. The footnote must be read in context. The issue before the Court in *Cotton Petroleum* was whether there was preemption of a severance tax on oil and gas produced on a reservation, not preemption of all taxation. If *Cotton Petroleum* were saying that the Self–Determination Act can never preempt a state tax, the opinion should have said that the Court was overruling *Ramah I*, which had found such preemption of a gross receipts tax.

{48} The gasoline taxes at issue in this case are not imposed when the gasoline is destined for federal use. Section 7–13–4 provides in pertinent part:

> In computing the gasoline tax due, the following amounts of gasoline may be deducted from the total amount of gasoline received in New Mexico during the tax period, provided satisfactory proof thereof is furnished to the department:
>
> . . . .
>
> B. gasoline received in New Mexico sold to the United States or any agency or instrumentality thereof for the exclusive use of the United States or any agency or instrumentality thereof. Gasoline sold to the United States includes gasoline delivered into the supply tank of a government-licensed vehicle of the United States[.]

Similarly, Section 7–13A–4(B) states:

> Petroleum products sold to the United States or any agency or instrumentality thereof for the exclusive use of the United States or any agency or instrumentality thereof are exempt from the imposition of the petroleum products loading fee.

{49} During the assessment period, however, there was no such deduction or exemption for gasoline used by tribal instrumentalities. As a result, there would be a clear and certain economic incentive for the Board to prefer that a federal agency, rather than the Board itself, perform those services—such as transportation of school children—requiring the use of gasoline. This incentive is contrary to a core purpose of the Self–Determination Act. The very title of the Act conveys that message. And the Act gets more explicit: 25 U.S.C.A. § 450a(a) (1998) states:

> The Congress hereby recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.

More importantly, Congress has provided that Indian communities will not suffer financially by the transfer of services from the federal government to tribal agencies. As stated in 25 U.S.C. Section 450j–1(a)(1) (1998), "The amount of funds provided under the terms of self-determination contracts entered into pursuant to this subchapter shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract....". Judge Wald described what the Act accomplishes as follows:

> The [Self–Determination Act] directs the Secretary, upon the request of an Indian Tribe, to turn over to that Tribe the direct operation of its federal Indian Programs. Once a Tribe requests control of its programs, the Secretary and the Tribe enter into a "self-determination contract," which the statute specifies must incorporate the provisions of a mandatory "model contract" included in the text of the [Act]. The Act requires the Secretary to provide to the Tribe the amount of funding that would have been appropriated for the federal government to operate the programs if they had not been turned over to the Tribe.

*Ramah Navajo School Board, Inc. v. Babbitt*, 87 F.3d 1338, 1341 (D.C.Cir.1996) (citations omitted). The Act's purpose of providing tribes with the same funding that the federal agency would receive for the same service is undercut if the State imposes a tax that makes performance of the service more expensive for the tribe than for the federal agency.

{50} Perhaps the closest United States Supreme Court precedent is an opinion that had nothing to do with Indian law. *Xerox Corp. v. County of Harris,* 459 U.S. 145, 103 S.Ct. 523, 74 L.Ed.2d 323 (1982), dealt with goods shipped from Mexico and held in a customs warehouse in Texas pending export from the United States. To encourage such arrangements, a series of federal enactments had eliminated duties on the goods involved. Xerox challenged a Texas personal property tax on the goods. The Supreme Court held that the tax was preempted. As summarized by Professor Tribe, the state tax "would manifestly discourage and indeed would financially penalize the very acts the federal law was meant to foster." Tribe, *supra,* § 6–26, at 484. The same words apply to the taxes before us.

{51} As if this were not already sufficient evidence of an irreconcilable conflict between New Mexico's tax and the core objectives of the Self–Determination Act, we are further informed by decisions like *Ramah I* and the federal policies favoring Indian self-governance that have been previously discussed. Although we have explained why, in our judgment, the preemption-by-implication doctrine does not mandate federal preemption under the specific facts of this case, the case law and policies supporting that doctrine nonetheless serve in a general way to guide us in discerning the meaning of specific statutes and "inform the determination whether the exercise of state authority has been preempted by operation of federal law." *Bracker,* 448 U.S. at 144, 100 S.Ct. 2578. When we read the Act we are instructed by specific pronouncements in United States Supreme Court opinions interpreting the Act and applying it to this very school district. Accordingly, in construing the language of the Act requiring that tribes receive the same funding that a federal agency would receive for the same service, we are mindful of how *Ramah I* described the Act as a comprehensive and pervasive federal scheme to promote "tribal self-sufficiency in the area of education" through "Indian-controlled institutions." 458 U.S. at 840, 843, 102 S.Ct. 3394. This background directs us toward a decision that the effect of this tax on the Board is irreconcilable with federal law.

{52} The precise scope of the preemption in this case is unclear, however. The New Mexico statutes provide a deduction or exemption from the gasoline taxes if the gasoline is "for the exclusive use of the United States or any agency or instrumentality thereof." Sections 7–13–4(B), 7–13A–4(B). According to the above analysis, the Board is entitled to a refund of taxes paid with respect to gasoline purchased from Patterson or Gunderson for the exclusive use of the Board. But what gasoline was for the Board's exclusive use? Gasoline would qualify if used by the Board in its own vehicles or in vehicles it leased from the federal government. On the other hand, we question whether refund is appropriate for taxes on gasoline sold at a discount to Board employees. Perhaps we could decide as a matter of law whether the gasoline sold to employees qualifies. But because the issue was not specifically addressed by the parties in the district court, the better course is to remand.

## CONCLUSION

{53} We reverse the district court judgment and remand for further proceedings consistent with this opinion.

{54} **IT IS SO ORDERED.**

RUDY S. APODACA, Judge and RICHARD C. BOSSON, Judge, concur.