STATE of Minnesota, Appellant,

v.

Peter John JONES, Respondent.

No. A05–365.

Supreme Court of Minnesota.

March 22, 2007.

Earl E. Maus, Cass County Attorney, Christopher J. Strandlie, First Assistant Cass County Attorney, Walker, MN, for Appellant.

Blair W. Nelson, Bemidji, MN, for Respondent.

Lori Swanson, Minnesota Attorney General, Angela M. Helseth, Assistant Attorney General, Sean R. McCarthy, Assistant Attorney General, St. Paul, MN, for Amici Curiae.

## OPINION

ANDERSON, PAUL H., Justice.

In December 2004, the Cass County Attorney filed a complaint against Peter John Jones for failing to register his current address with the appropriate authorities. More particularly, the county attorney charged Jones with violating Minn. Stat. § 243.166 (2002),[1] which requires a person who is convicted of certain "predatory" offenses to register his current address with the appropriate authorities and to complete and return address-verification forms. Jones, who is an enrolled Indian tribal member and resides on his reservation, moved to dismiss the charges, arguing that section 243.166 is civil/regulatory in nature and therefore the State of Minnesota lacks subject matter jurisdiction to prosecute Jones. The state responded by asserting that section 243.166 is crimi-

---

1. Section 243.166 has been amended several times since the conduct at issue in this case began. Accordingly, we cite the 2002 version of Minnesota Statutes for section 243.166.

nal/prohibitory in nature and therefore the state has subject matter jurisdiction to prosecute Jones. The Cass County District Court granted Jones's motion to dismiss and the Minnesota Court of Appeals affirmed. *State v. Jones,* 700 N.W.2d 556, 558 (Minn.App.2005). Because we conclude that a tribal member's violation of section 243.166 is a criminal/prohibitory offense and therefore the state has subject matter jurisdiction, we reverse.

Respondent Peter John Jones is an enrolled member of the Leech Lake Band of Ojibwe and resides on the Leech Lake Indian Reservation. In 1996, he committed an offense for which he was subsequently convicted of and sentenced for kidnapping under Minn.Stat. § 609.25 (2006). A person convicted of kidnapping is required to register his current address with the proper authorities. Minn.Stat. § 243.166, subd. 1(a)(1)(ii) (2002).

In July 2001, as required by Minn.Stat. § 243.166, Jones registered his Leech Lake Reservation address. On July 1, 2002, and June 30, 2003, the Minnesota Bureau of Criminal Apprehension (BCA) sent Jones address-verification requests, but Jones failed to reply as required by Minn.Stat. § 243.166, subd. 4(e)(2) (2002). Subsequently, on July 21, 2003, Jones completed a change of address form, notifying the BCA that he had moved to a new address on the Leech Lake Reservation. On July 24, 2003, the BCA sent Jones an address-verification request, and Jones again failed to reply. On March 11, 2004, a Cass County deputy sheriff, who was performing routine checks on registered offenders, checked the address provided by Jones on his change of address form. Jones's mother was at the address Jones had provided to the BCA. She informed the deputy that her son was no longer living at that address and provided the

deputy with her son's current address, which was also on the Leech Lake Reservation. On March 30, 2004, the BCA sent an address-verification request to the address provided by Jones's mother, and Jones again failed to reply. Finally, on June 28, 2004, the BCA sent an address-verification request to the last address Jones reported to the BCA, but Jones did not reply.

In December 2004, the state charged Jones with one count of failing to notify the BCA of his change of address and five counts of failing to return the required address-verification forms in violation of Minn.Stat. § 243.166, subds. 3(b), 4(e), 5 (2002). Jones moved to dismiss the charges, arguing that the State of Minnesota lacked subject matter jurisdiction to prosecute him. A hearing was held on the motion and the district court granted Jones's motion to dismiss. The court concluded that Minn.Stat. § 243.166 is civil/regulatory in nature, and therefore the state lacked subject matter jurisdiction to prosecute Jones. The state appealed, and the court of appeals affirmed the district court. *Jones,* 700 N.W.2d at 558. The state then sought review by our court, arguing that both the district court and the court of appeals erred in concluding that the state lacked jurisdiction.

Jones is charged with violating section 243.166, which requires registration by persons who have been convicted or adjudicated delinquent of first-degree murder involving criminal sexual conduct; kidnapping; criminal sexual conduct; indecent exposure; a variety of solicitation and pornography offenses involving minors, or another offense arising out of the same circumstances; and persons convicted of a so-called predatory crime and sentenced as a patterned sex offender under Minn.Stat.

§ 609.108 (2002).[2] Minn.Stat. § 243.166, subd. 1(a) (2002). Additionally, Minn.Stat. § 243.167 (2002)[3] requires persons to register under section 243.166 who (1) have been convicted of a specified "crime against the person" and have previously been convicted or adjudicated of an offense listed in section 243.166, subd. 1(a), but were not required to register at the time; or (2) have previously completed the registration requirements of section 243.166 and commit a crime against the person. A Minnesota resident who is subject to these sections is required to register with his assigned corrections agent or, if none, with the law enforcement authority in the area of his residence. Minn.Stat. § 243.166, subd. 3(a) (2002).

At least five days before starting to live at a new primary residence, a person subject to section 243.166 is required to give written notice of his new address to the corrections agent or law enforcement authority with which he is registered. *Id.,* subd. 3(b). Changes in primary address are forwarded to the BCA. *Id.* The BCA is required to mail an address-verification form to the person's last reported address, and the person is required to return the signed form by mail within ten days after receiving it. *Id.,* subd. 4(e). A person required to register under this section who knowingly violates any of its provisions or intentionally provides false information is guilty of a felony with a maximum sentence of five years in prison, a fine up to $10,000, or both. *Id.,* subd. 5(a) (2002). The minimum sentence is one year and one day for the first offense and two years for a subsequent offense. *Id.,* subd. 5(b)-(c) (2002). Whether the State of Minnesota has jurisdiction to enforce section 243.166 with respect to Jones, who is an enrolled member of an Indian tribe charged with an offense committed on his reservation,[4] is an issue that we review de novo. *See State v. Busse,* 644 N.W.2d 79, 82 (Minn.2002).

We begin our analysis with the premise that the state's authority to exercise subject matter jurisdiction over Indians is governed by federal law. *See* Act of Aug. 15, 1953, Pub.L. No. 280, 67 Stat. 588 (partially codified at 18 U.S.C. § 1162 (2000)); *accord State v. R.M.H.,* 617 N.W.2d 55, 58 (Minn.2000). Under Public Law 280, Minnesota has broad criminal and limited civil jurisdiction over all "Indian country" within the state, except for the Red Lake Reservation and the Bois Forte Reservation at Nett Lake. *See State v. Stone,* 572 N.W.2d 725, 728 & 728 n. 3 (Minn.1997). In *R.M.H.,* we explained the analytical framework for determining whether the state has subject matter jurisdiction in a particular case:

> [S]tate law does not generally apply to tribal Indians on their reservation absent express consent from Congress. However, even absent such express consent, a state may exercise its authority if the operation of federal law does not preempt it from doing so.

**2.** Minnesota Statutes § 609.108 was repealed in 2005 and 2006. Act of June 2, 2005, ch. 136, art. 2, § 23, 2005 Minn. Laws 901, 933 (repealing section 609.108, subd. 2); Act of June 1, 2006, ch. 260, art. 1, § 48, 2006 Minn. Laws 707, 732 (repealing section 609.108, subds. 1, 3–7).

**3.** Section 243.167 was amended in 2005, after the conduct at issue in this case was committed. Act of June 2, 2005, ch. 136, art. 3, § 9, 2005 Minn. Laws 901, 951. Accordingly, we cite the 2002 version of the Minnesota Statutes for section 243.167.

**4.** Because Jones resides on his reservation, his failure to maintain a current address registration was necessarily an offense that was committed on his reservation.

\* \* \* [T]he same analytical framework that we applied in *Stone* is appropriate here. \* \* \* In order to determine whether Congress had expressly consented to state jurisdiction, we first examined Pub.L. 280, which expressly grants Minnesota broad \* \* \* criminal and limited civil jurisdiction over specified areas of Indian country.

\* \* \* \*

\* \* \* This grant of jurisdiction was intended to combat the problem of lawlessness on reservations and a lack of tribal law enforcement. \* \* \* Pub.L. 280 grants states "broad criminal jurisdiction over offenses committed by or against Indians within all Indian country within the State." \* \* \* [A] state statute is "criminal/prohibitory," and therefore within Pub.L. 280's grant of jurisdiction, if the statute is generally intended to prohibit certain conduct. \* \* \* [A] statute does not fall within Pub.L. 280's grant of jurisdiction if it generally permits the conduct at issue, subject to regulation. In the latter case, the statute is properly classified as "civil/regulatory" and Pub.L. 280 does not expressly grant the state jurisdiction to enforce the statute on an Indian reservation.

617 N.W.2d at 58–59 (citations omitted).

Applying this analytical framework, we must ascertain whether Minn.Stat. § 243.166 is *civil/regulatory* or *criminal/prohibitory* in order to determine whether Congress has expressly consented to Minnesota's jurisdiction to enforce this statute against an enrolled tribal member residing on his reservation. *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207–08, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *Busse,* 644 N.W.2d at 83. The United States Supreme Court noted in *Cabazon* that the distinction between civil/regulatory and criminal/prohibi-tory is not a bright-line rule, and that "[t]he applicable state laws governing an activity must be examined in detail before they can be characterized as regulatory or prohibitory." 480 U.S. at 210, 211 n. 10, 107 S.Ct. 1083.

■ In *Stone*, we adopted a two-step test to determine whether a law is civil/regulatory or criminal/prohibitory under *Cabazon.* 572 N.W.2d at 730. The first step is to determine the focus of our analysis—whether to analyze the broad conduct or the narrow conduct at issue. *Id.* We will focus on the broad conduct "*unless* the narrow conduct presents substantially different or heightened public policy concerns." *Id.* When the narrow conduct presents substantially different or heightened public policy concerns, we will focus on the narrow conduct. *Id.*

■ After we determine the proper focus, the second step in the *Cabazon/Stone* test is to determine if the conduct at issue is generally permitted but subject to regulation, or if it is generally prohibited. *Id.* Conduct generally permitted, subject to exceptions, is civil/regulatory, and conduct generally prohibited is criminal/prohibitory. *Id.* In close cases, we may utilize *Cabazon's* "shorthand public policy test." *Id.* In *Stone,* we concluded that under the "shorthand public policy test," conduct is criminal/prohibitory if it violates the state's public *criminal* policy. *Id.* We explained that "[p]ublic criminal policy goes beyond merely promoting the public welfare. It seeks to protect society from serious breaches in the social fabric which threaten grave harm to persons or property." *Id.* In *Stone,* we identified four nonexclusive factors that are useful in determining whether an activity violates public criminal policy in a manner serious enough to be considered "criminal": (1) the extent to which the activity directly threatens physical harm to others or prop-

erty, or invades the rights of others; (2) the extent to which the law allows for exceptions and exemptions; (3) the blameworthiness of the actor; and (4) the nature and severity of the potential penalties for a violation of the law. *Id.* (footnote omitted).

█ To determine whether the state has subject matter jurisdiction to prosecute Jones for violating Minn.Stat. § 243.166, we must first identify the broad and narrow conduct covered by the statute and decide which conduct should be the subject of our focus under the *Cabazon/Stone* test. In its decision, the court of appeals stated, "We are unable to find any meaningful distinction here between broad and narrow conduct" and "[t]he conduct at issue is Jones's failure to keep the authorities apprised of his residence address." *Jones,* 700 N.W.2d at 559. The court then stated that "people living in Minnesota have no general obligation to register their residence addresses with state authorities," and "the registration requirement for predatory offenders is an exception to that proposition." *Id.* at 560.

We disagree with the court of appeals' characterization of the broad conduct at issue as registration by Minnesota residents in general. We conclude that the broad conduct at issue is residing at an address or moving to a new address by Minnesota residents in general. The narrow conduct we must analyze is an identified predatory offender residing or moving without maintaining a current address registration with the proper authorities. Our characterization of the broad and narrow conduct at issue based on what is required or prohibited of certain populations is consistent with our approach in *Busse.* In *Busse,* we concluded that the broad conduct was driving by people in general, and the narrow conduct was driving by a person whose driver's license had been cancelled as inimical to public safety. 644 N.W.2d at 83.[5]

Having identified the broad and narrow conduct at issue, we must next determine which conduct should be the subject of our focus under the *Cabazon/Stone* test. *Stone,* 572 N.W.2d at 730. As noted above, when the narrow conduct presents substantially different or heightened public policy concerns, we will focus on the narrow conduct in applying the *Cabazon/Stone* test. *Id.* As the court of appeals correctly noted, Minnesota residents have no general obligation to register their residence address with state authorities. Registration is required only for those persons who have been convicted of certain felonies, including first-degree murder involving criminal sexual conduct, kidnapping, criminal sexual conduct, indecent ex-

---

**5.** The dissent apparently contends that our identification of the broad and narrow conduct at issue in this case departs from *Busse* because

[t]he statute at issue in *Busse* dealt with [the broad conduct of driving and] the narrow conduct of driving after cancellation * * * by *anyone* whose driver's license had been cancelled. In contrast, Minn.Stat. § 243.166 does not purport to bar registered offenders from living in certain areas or communities, and does not prohibit them from moving * * *.

But the "contrast" the dissent attempts to draw rests on a distinction without a differ-

ence. The broad conduct we identified in *Busse*—driving—is generally permissible except by a person whose license has been revoked under the relevant statute. Similarly, the broad conduct we identify in this case—residing at or moving to any address—is generally permissible except by predatory offenders who fail to maintain a current address registration as required by the relevant statute. That only "predatory offenders"—and not "anyone"—may engage in the narrow conduct at issue in this case does not provide a basis for the dissent's apparent conclusion that we are departing from *Busse,* rather than applying it.

posure, and a variety of solicitation and pornography offenses involving minors. We conclude that the fact that the legislature established a predatory offender registration system is an indication that the whereabouts of predatory offenders—in comparison with the whereabouts of the general population—"presents [a] substantially different or heightened public policy concern[ ]." *Stone*, 572 N.W.2d at 730.

Our review of the legislative history of section 243.166 indicates that the public policy concerns associated with persons convicted of specified predatory crimes have grown over time. Section 243.166 was enacted in 1991 in response to a highly publicized kidnapping. Act of June 1, 1991, ch. 285, § 3, 1991 Minn. Laws 1324, 1325; *Governor's Task Force on Missing Children Final Report* 3, 7 (1991). In 1993, the legislature amended the statute to expand the scope of its application. Act of May 20, 1993, ch. 326, art. 10, § 1, 1993 Minn. Laws 1974, 2090. In 2000, after another highly publicized kidnapping, the legislature significantly revised section 243.166 and related statutes. Act of Apr. 3, 2000, ch. 311, art. 2, 2000 Minn. Laws 185, 189–207; *Protection from Predators,* Session Weekly (Minn. House of Reps. Pub. Info. Office), Mar. 31, 2000, at 14. The legislature increased the offense grade for a violation of section 243.166 from a gross misdemeanor to a felony and imposed a mandatory prison sentence for its violation. Art. 2, § 6, 2000 Minn. Laws at 194.

The 2000 revisions also brought Minnesota into compliance with requirements under the federal Jacob Wetterling Act. *See* Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, Pub.L. No. 103–322, 108 Stat. 2038 (1994) (codified at 42 U.S.C. § 14071 (2000)). Among other things, the revisions required registration by additional offenders, lengthened the registration period for certain offenders, required the collection of additional information from certain offenders, required the BCA to maintain a computerized database of information on sex offenders, provided a procedure for treatment facilities to release information about offenders, expanded and clarified the community notification law, and authorized the posting of information about level III offenders on the Internet and the disclosure of certain information about noncompliant offenders. Act of Apr. 3, 2000, ch. 311, art. 2, 2000 Minn. Laws 185, 189–207. In 2003, the legislature defined "primary residence" and "secondary residence," clarified that an offender must immediately notify the proper authorities when the offender's primary address no longer applies, and clarified that new address and vehicle information must be provided even if the offender had not previously reported the information. Act of May 27, 2003, ch. 116, § 2, 2003 Minn. Laws 685, 686. To further illustrate the point that section 243.166 has undergone extensive expansion, we note that, in recent years, section 243.166 has significantly increased in length, going from approximately two pages of the statute books in 1998 to nine pages in 2006. *Compare* Minn.Stat. § 243.166 (1998) *with* Minn.Stat. § 243.166 (2006).

We conclude that the legislative history of section 243.166 indicates that a predatory offender residing or moving without maintaining a current address registration with the proper authorities presents a substantially different or heightened public policy concern when compared with Minnesota residents in general. We also conclude, based especially on the significant revisions to section 243.166 in 2000, that this public policy concern has increased during the last several years. We therefore conclude that our focus under the *Cabazon/Stone* test should be on the narrow conduct of a predatory offender

residing or moving without maintaining a current address registration with the appropriate authorities.

Having concluded that the narrow conduct of a predatory offender should be our focus under the *Cabazon/Stone* test, our second step under the test is to determine if a predatory offender residing or moving without maintaining a current address registration is generally permitted, subject to exceptions, or if it is generally prohibited. *Stone*, 572 N.W.2d at 730. With our focus properly placed on the narrow conduct in this case, we conclude that the conduct is unequivocally prohibited by section 243.166. A person who is required to register under section 243.166 cannot legally avoid this requirement. The statute allows no exceptions. As we observed in *Stone*, conduct that is generally prohibited is criminal/prohibitory. 572 N.W.2d at 730. We therefore conclude that section 243.166 is properly categorized as criminal/prohibitory under the *Cabazon/Stone* test.

While we do not consider this to be a close case, we note that the same result would be mandated under the *Cabazon/Stone* "shorthand public policy test." *Stone*, 572 N.W.2d at 730. As noted above, when applying the "shorthand test," we consider four nonexclusive factors in determining "whether an activity violates the state's public policy in a nature serious enough to be considered 'criminal.'" *Id.* First, we consider the extent to which the activity directly threatens physical harm to others or property, or invades the rights of others. In *Busse*, we concluded that it is appropriate to consider the nature of the charged offense in determining the extent to which an activity directly threatens physical harm. 644 N.W.2d at 85. In that case, Busse asserted that driving after his driver's license had been cancelled as inimical to public safety could not pose height-

ened public policy concerns because he was not intoxicated at the time of the driving at issue. *Id.* We concluded that *any* driving by a person whose driver's license had been cancelled as inimical to public safety because of at least three driving-under-the-influence convictions poses a risk to public safety. *Id.* at 85–86.

The same reasoning guides our analysis of the threat of physical harm to others posed by a predatory offender's failure to maintain a current address registration. The rationale behind the registration requirement is that persons convicted of first-degree murder involving criminal sexual conduct, kidnapping, criminal sexual conduct, and other enumerated predatory crimes pose a greater risk to public safety than the general population. It is difficult to dispute that predatory offenders pose a threat to public safety. While registration information is generally classified as private data on individuals, it may be made public if an offender 16 years or older is out of compliance with registration requirements for 30 days or longer. Minn. Stat. § 243.166, subds. 7, 7a(a) (2002). The purpose of publicizing registration information of noncompliant offenders is "for the public to assist law enforcement in locating the offender." *Id.*, subd. 7a(a). We conclude that the need for the public to aid law enforcement in locating predatory offenders who fail to maintain a current address registration emphasizes the threat of direct physical harm that noncompliant offenders pose. We therefore conclude that the first factor of the *Cabazon/Stone* shorthand test supports our conclusion that section 243.166 is criminal/prohibitory.

Applying the second factor of the shorthand test—the extent to which the law allows for exceptions and exemptions—we note that section 243.166, subd. 5, categorically prohibits predatory offenders from

failing to register and there is no exception in the law.

As to the third factor—the blameworthiness of the actor—Jones does not argue that he was unaware of the registration requirements of section 243.166. Moreover, such an argument would be unconvincing given Jones's partial compliance with the statute. Jones registered as required in 2001 and submitted a change of address form to the BCA in 2003. But over the course of two years, Jones failed to return five address-verification forms that were sent to at least two different addresses provided by Jones himself and by his mother. We conclude that Jones was aware of the requirements of section 243.166 and knowingly refused to comply with those requirements. We therefore conclude that Jones has demonstrated a high level of blameworthiness in failing to maintain a current address registration.

Finally, applying the fourth factor of the *Cabazon/Stone* shorthand test, we consider the nature and severity of the potential penalties for a violation of section 243.166. As noted above, a person required to register under section 243.166 who knowingly violates any of its provisions or intentionally provides false information is guilty of a felony with a maximum sentence of five years in prison, a fine up to $10,000, or both. Minn.Stat. § 243.166, subd. 5(a). The minimum sentence is one year and one day for a first offense and two years for a subsequent offense. *Id.*, 5(b)-(c). The existence of a criminal penalty alone does not dictate that a law is criminal/prohibitory, and we do not rely exclusively on the criminal penalty here. *See Cabazon*, 480 U.S. at 211, 107 S.Ct. 1083. But the legislature's determination that a violation of section 243.166 is a felony is one factor supporting a conclusion that section 243.166 "seeks to protect society from serious breaches in the social fabric which threaten grave harm to persons or property." *Stone*, 572 N.W.2d at 730.

Having applied each of the four factors in the *Cabazon/Stone* "shorthand public policy test"—namely, determining the extent to which a predatory offender's failure to maintain a current address registration directly threatens physical harm to others; the extent to which section 243.166 allows for exceptions and exemptions; Jones's blameworthiness; and the nature and severity of the potential penalties for a violation of section 243.166—we believe that our conclusion that section 243.166 is criminal/prohibitory in nature is well-supported by our decision in *Stone*.

Our application of the *Cabazon/Stone* test has led us to conclude that it is not a close call whether section 243.166 is criminal/prohibitory; but our *Cabazon/Stone* analysis does not end our inquiry. Specifically, we must address Jones's argument that our holdings in *Boutin v. LaFleur*, 591 N.W.2d 711, 717 (Minn.1999), and *Kaiser v. State*, 641 N.W.2d 900, 907 (Minn. 2002), mandate a conclusion that section 243.166 is civil/regulatory in nature. We disagree with this argument because section 243.166 has been significantly revised since these cases were decided and because neither case addressed the classification of section 243.166 under the *Cabazon/Stone* test.[6] In *Boutin* and *Kaiser* we were not asked—nor did we determine—whether section 243.166 is criminal/prohibitory versus civil/regulatory under *Cabazon*. Because this question was not before us, we did not conduct the two-step *Cabazon/Stone* test to reach our decisions.

---

6. Although *Kaiser* was decided in 2002, our opinion interpreted the 1998 version of section 243.166. 641 N.W.2d at 902.

In addressing the heightened public policy concerns under the *Cabazon/Stone* test, we have already noted the significant revisions to section 243.166 and related statutes by the 2000 legislature; but those revisions are worth repeating here. The 2000 revisions increased the offense grade for a violation of section 243.166 from a gross misdemeanor to a felony, brought Minnesota into compliance with requirements under the federal Jacob Wetterling Act, required registration by a larger group of offenders, lengthened the registration period for certain offenders, required the collection of additional information from certain offenders, required the BCA to maintain a computerized database of information on sex offenders, provided a procedure for treatment facilities to release information about offenders, expanded and clarified the community notification law, and authorized the posting of information about level III offenders on the Internet and disclosure of certain information about noncompliant offenders. Act of Apr. 3, 2000, ch. 311, art. 2, 2000 Minn. Laws 185, 189–207.

Significantly, both *Boutin* and *Kaiser* addressed the 1998 version of section 243.166, which did not reflect the foregoing revisions. Moreover, in *Boutin* and *Kaiser*, we addressed an entirely different issue—whether the duty to register under section 243.166 is a punishment for a conviction of a predatory offense—not whether the failure to maintain a current address registration is generally prohibited conduct. More particularly, in *Boutin* and *Kaiser* we were asked to determine whether the duty to register as a predatory offender as a consequence of a conviction for a specified offense is, in essence, a punishment from which we could conclude that section 243.166 is criminal, punitive rather than civil, regulatory in nature.

*Boutin* was a declaratory judgment action challenging the section 243.166 requirement to register following conviction for "another offense arising out of the same set of circumstances" as a criminal sexual conduct charge. 591 N.W.2d at 713–14. Boutin argued that the statute *violated substantive due process* by infringing on his presumption of innocence because it presumed him guilty of an enumerated predatory offense of which he was not actually convicted. *Id.* at 716. Rejecting that claim, we held that the fundamental presumption-of-innocence right only applies to statutes that "are punitive, or criminal, in nature." *Id.* at 717. We then applied the factors the Supreme Court enumerated in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), and held that section 243.166 is not a punitive statute *for due process purposes* because (1) registration does not require an affirmative disability or restraint; (2) historically, registration statutes have not been regarded as punishment; (3) "the registration statute does not promote the traditional aims of punishment since it does not involve confinement and is not intended to exact retribution"; and (4) "the primary purpose of the statute is to create an offender registry to assist law enforcement with investigations." *Boutin*, 591 N.W.2d at 717. Because we concluded that section 243.166 was not *punitive*, we concluded that the statute was "civil, regulatory" under the *Kennedy* analysis. *Id.*

In *Kaiser*, we similarly concluded that the statutory duty to register as a predatory offender that arises because of a conviction for a specified offense is not a "punitive" consequence of the conviction for the underlying offense. 641 N.W.2d at 907. Rather, the duty to register is a collateral consequence of a defendant's guilty plea for the underlying offense. *Id.* We reviewed our holding in *Boutin*, indicating that in *Boutin* we had applied the *Kenne-*

*dy* analysis and noted that the predatory offender statute does not require an affirmative restraint; that, historically, similar registration statutes have not been regarded as punishment; that the statute does not promote the traditional aims of punishment because it does not involve confinement and is not intended to exact retribution; and that the primary purpose of the statute is to create an offender registry to assist in law enforcement investigations. *Kaiser*, 641 N.W.2d at 905. We elaborated on the primary purpose of the statute by noting that section 243.166

> is an expression of a policy statement— "society has the right to know of predatory offenders' presence not in order to punish them, but in order to protect itself." As statutes criminalizing the possession of firearms by convicted felons, or revoking driving privileges after a conviction for driving under the influence, require offenders to obey special regulations, the predatory offender law seeks to increase public safety by requiring a specific class of offenders to provide information to law enforcement authorities to assist in keeping track of them.

*Id.* at 905–06 (citation and footnotes omitted).

We acknowledge that our use in *Boutin* and *Kaiser* of the terms "punitive"—which we used interchangeably with "criminal"— and "civil, regulatory" could cause confusion in our analysis under the *Cabazon/Stone* test, which distinguishes conduct that is "criminal/prohibitory" from that which is "civil/regulatory." But "punitive" is not the same as "prohibitory," and the definition of "regulatory" under the *Kennedy* analysis of *Boutin* and *Kaiser* does not have the same meaning as "regulatory" employed by Pub.L. 280 and *Cabazon*.[7] Further, neither *Boutin* nor *Kaiser* required us to conduct an analysis under the highly refined *Cabazon/Stone* test, which we have applied here in a context that does not present a close call.[8] Therefore, for all the foregoing reasons, we conclude that *Boutin* and *Kaiser* are distinguishable and do not require us to conclude that section 243.166 is civil/regulatory in nature under the *Cabazon/Stone* test.

At this point, it is necessary to note that the dissent apparently seeks to characterize our analysis as one that elevates form over substance. But in doing so, the dissent fails to fully appreciate the distinction between "criminal/prohibitory" and "punitive." Specifically, the dissent fails to acknowledge that "criminal/prohibitory" for the purposes of the *Cabazon/Stone* test is substantively different from "punitive" for the purposes of the issues raised by *Boutin* and *Kaiser*—respectively, the constitutional guarantee of due process and the right to withdraw a guilty plea.[9] This

7. We further note that in *Kennedy*, the Supreme Court did not use the terms "civil" or "criminal"; rather, the Court's analysis focused on whether the statute was "regulatory" or "penal." *See Kennedy*, 372 U.S. at 168, 83 S.Ct. 554.

8. At this point it is important to reiterate that *Cabazon* used Pub.L. 280 as its template and focused on the "prohibitory/regulatory" distinction made in this federal statute. The Supreme Court then went on to conclude that the "prohibitory/regulatory" distinction was not a bright-line rule, and the Court therefore established a test to make this distinction in close cases. Neither *Boutin* nor *Kaiser* focused on Pub.L. 280 or the "prohibitory/regulatory" distinction that Congress articulated. *Cabazon*, 480 U.S. at 207–11, 107 S.Ct. 1083.

9. Moreover, the dissent fails to fully acknowledge that we do not have a choice as to whether we apply the *Cabazon/Stone* test in this case. Because the *Cabazon/Stone* test is federally mandated, we cannot alter or add nuances to it, as much as the dissent might like us to do so.

failure leads the dissent to incorrectly construe the issue before us and, even worse, to apparently conclude that our decision will lead to discrimination against Native Americans in the due process context. Such discrimination is surely not our intention, and will not be the result from our decision.

■ Based on our conclusion that Minn. Stat. § 243.166 is criminal/prohibitory, we hold that the district court and court of appeals erred when they concluded that Minnesota courts do not have jurisdiction to enforce the statute against a tribal member who fails to register while residing on his Indian reservation. Therefore, we further hold that Minnesota courts have subject matter jurisdiction to enforce the charge of residing or moving without maintaining a current address registration against Jones, even though he is an enrolled member of the Leech Lake Band of Ojibwe who resides—and therefore violated section 243.166—on the Leech Lake Reservation.

Reversed.

ANDERSON, G. Barry, Justice (Concurring).

I concur in the result reached by the majority. I write separately because I reach that result in a different way. I find the majority's reliance on Public Law 280 and the distinction between a "criminal/prohibitory" law and a "punitive" law tenuous and unnecessary in this case.

The United States Supreme Court has not established a *per se* rule precluding state jurisdiction over tribes and tribal members absent express Congressional consent. *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 214–15, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). "[A] state may assert jurisdiction over the on-reservation activities of tribal members," without authorization from Pub.L. 280 or otherwise, under "exceptional circumstances." *Cabazon,* 480 U.S. at 215, 107 S.Ct. 1083 (quoting *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 331–32, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983)). In *State v. Stone,* for example, we decided that Pub.L. 280 did not authorize the state to enforce traffic regulations against tribal members traveling a highway on their reservation, and then turned to consider whether the case presented exceptional circumstances allowing regulation without statutory authorization. 572 N.W.2d 725, 731–32 (Minn.1997).

When Pub.L. 280 does not expressly authorize state jurisdiction, we ask whether federal law preempts state jurisdiction. *State v. R.M.H.,* 617 N.W.2d 55, 60 (Minn. 2000); *see also Stone,* 572 N.W.2d at 731. In a preemption analysis, traditional notions of Indian sovereignty serve as a "backdrop against which the applicable treaties and federal statutes must be read." *Okla. Tax Comm'n v. Sac & Fox Nation,* 508 U.S. 114, 123–24, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993) (quotation omitted). Far from preempting state authority to require convicted kidnappers to report their addresses to the state, Congress requires states to do so under the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act. *See* 42 U.S.C. § 14071 (2000). So we must consider whether the circumstances here are "exceptional," as required by *Mescalero* and *Cabazon,* such that the state can regulate the on-reservation conduct of tribal members.

The Supreme Court has offered no guidance as to which circumstances are "exceptional." Lacking such guidance, we look to the cases in which the Court has allowed on-reservation regulation absent express Congressional authorization. A state can tax on-reservation sales of cigarettes to

non-members. *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 155, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 483, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). *Colville* examined the competing interests of the state and the tribe, holding that the state could collect taxes from cigarettes sold on-reservation even though the tax would put the tribe at a competitive disadvantage to surrounding retailers and would impose an administrative burden on tribal smokeshops. 447 U.S. at 156–59, 100 S.Ct. 2069. A state can also tax the on-reservation sale of liquor to non-members. *Rice v. Rehner*, 463 U.S. 713, 720, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983). In *Rice*, the Court noted that Indian tribes lacked "a tradition of self-government in the area of liquor regulation" and that Congress did not intend to preempt states from regulating the sale of liquor. *Id.* at 731, 103 S.Ct. 3291. A state can also regulate fishing by tribal members on a river when the treaty granting the right to fish states that the right is to be exercised "in common with all citizens of the Territory" and when the tribe has alienated the river in fee simple absolute. *Puyallup Tribe, Inc. v. Dept. of Game*, 433 U.S. 165, 174–75, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977).

Following the example of *Colville, Moe, Rice*, and Puyallup, we must weigh the federal, state, and tribal interests at stake in the particular case before us to determine whether the state can regulate. Whatever principles might be gleaned from these cases, the state's need to know the whereabouts of convicted kidnappers on Indian reservations qualifies as "exceptional" in comparison. The federal government's interest here is low, and the state's power to regulate high, because Congress requires states to conduct registration of predatory offenders. The state's interest in keeping track of convicted kidnappers is at least as high as its interest in collecting cigarette and liquor taxes from on-reservation sales or in regulating fishing on tribal waters. And the reporting requirement places no burden whatsoever on the tribe—the convict alone bears the minimal burden of filling out occasional address verifications. Because nothing is required of the tribe, the threat to its sovereignty is minimal.

The Supreme Court's most recent statement on the subject supports this conclusion. In *Nevada v. Hicks*, 533 U.S. 353, 361–62, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), the Court explained:

> Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border. Though tribes are often referred to as "sovereign" entities, it was "long ago" that "the Court departed from Chief Justice Marshall's view that 'the laws of [a state] can have no force' " within reservation boundaries. "Ordinarily," it is now clear, "an Indian reservation is considered part of the territory of the State."

(Citations omitted.) Therefore, "[w]hen * * * state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land." *Id.* at 362, 121 S.Ct. 2304 (citing *Colville*, 447 U.S. at 151, 100 S.Ct. 2069).

I do not read *Stone*, a case in which we found no exceptional circumstances, to undermine this position. In *Stone*, we held that the state's interest in enforcing traffic laws against tribal members on-reservation could not overcome " 'the right of reservation Indians to make their own laws and be ruled by them.' " 572 N.W.2d

at 732, (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)). We noted our confidence in the ability of Indian tribes to enforce reasonable traffic and driving regulations. *Stone,* 572 N.W.2d at 732. We also observed that cases presenting "exceptional circumstances" have primarily involved an indirect government purpose to regulate non-Indians, and that the one case in which the Supreme Court permitted state regulation of Indians on a reservation without either a federal grant or a primary purpose of regulating nonmembers was *Puyallup. Id.* at 731–32.

Unlike the situation we considered in *Stone,* an Indian tribe has no obligation or incentive to create or enforce reporting requirements related to *state* criminal convictions. Indeed, expecting tribes to do so would constitute a greater infringement on their sovereignty than leaving the matter to the state. And requiring a convicted tribal member to fill out periodic address—verification forms is less intrusive and burdensome than requiring tribal cigarette and liquor vendors to collect and remit state taxes from sales to non-members or requiring tribal anglers to submit to state fishing regulations. It is true, as we noted in *Stone,* that to date the Supreme Court has just once allowed regulation of on-reservation conduct by tribal members without an indirect purpose of regulating non-members. But the state's indirect purpose here is to protect potential kidnapping victims, and that purpose is at least as important as a state's indirect purpose to regulate cigarette or liquor purchasers by collecting sales taxes.

The dissent correctly points out that *Puyallup* is the only case in which the Supreme Court has found "exceptional circumstances" permitting a state to regulate the on-reservation activities of tribal members.[1] This in itself means nothing, except that *Puyallup* is the only decision the Court has made on the issue. The only case in which the Court has looked for and not found exceptional circumstances when a state sought to regulate tribal members on their reservation was *Cabazon,* in which the state's regulatory efforts were clearly preempted because the activity to be regulated (tribal bingo enterprises) was directly approved of and promoted by federal law. 480 U.S. at 218–19, 107 S.Ct. 1083. Here, we have the opposite situation—the federal government has ordered the states to regulate. The dissent also correctly points out that there is a difference between regulating tribal members and nonmembers. But the dissent cannot explain, because the Supreme Court has not explained, what that difference is.

The dissent, apparently, would interpret the Court's scant, unenlightening jurisprudence in this area as a near or total bar to state regulation. But the absence of meaningful guidance from the Court does not suggest that state regulation is never permitted. On the contrary, *Cabazon* makes clear that states can sometimes regulate tribal members on their reservation, and *Hicks* makes clear that the Court is increasingly willing to allow state regulation on-reservation where important state interests are implicated. As the law stands, it falls to us to determine with a fact-based inquiry when the state can regulate. Performing this inquiry, it seems

1. While this is technically true, it is a semantic distinction with less significance than the dissent suggests. The Court's decisions in *Colville, Moe,* and *Rice,* while nominally allowing regulation of liquor and cigarette purchases by non-tribal members, actually allowed the state to directly regulate tribal smokeshops and liquor stores by forcing them to collect sales taxes and report those taxes to the state. In those cases, the burden of state regulation fell equally if not more heavily on tribal members.

clear that if the state can ever reach the on-reservation conduct of tribal members (and it can), it can do so here.

I would hold that the state's interest in tracking convicted kidnappers is so high, and the threat to tribal sovereignty so low, as to constitute an exceptional circumstance under Supreme Court precedent. The state may therefore require tribal members convicted of kidnapping to report their address to the state regardless of whether Pub.L. 280 expressly grants authority to do so.

GILDEA, Justice (concurring).

I join in the concurrence of Justice G. Barry Anderson.

PAGE, Justice (dissenting).

I respectfully dissent.

The issue here is whether the State of Minnesota has jurisdiction to enforce Minn.Stat. § 243.166 (2002) against an enrolled member of an Indian tribe who resides on the reservation of his tribe. Section 243.166 requires that certain predatory offenders provide the address of their residence to their assigned corrections agent or to law enforcement authorities. Minn.Stat. § 243.166, subd. 3(b) (2002). Despite the sovereignty of Indian tribes, state laws may be applied to tribal members: (1) if Congress has expressly so provided; and (2) under exceptional circumstances even if Congress has not expressly provided. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207, 214–15, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). The court finds express Congressional authorization for the enforcement of section 243.166 in Pub.L. 280. As the court recites, Pub.L. 280 (partially codified at 18 U.S.C. § 1162 (2000)) gives the state broad criminal, but limited civil, jurisdiction over most "Indian country" within the state.

The court now holds that section 243.166 is enforceable against enrolled tribal members on the reservation because it is "criminal prohibitory" in nature. It does so in spite of the fact that we have, in the past, twice held that section 243.166 is civil and regulatory, not criminal or penal. In light of these holdings, the court's reasoning is flawed.

The concurrence fares no better. The concurrence finds the circumstances here to be "exceptional," justifying the state's assertion of jurisdiction over Jones. For its definition of "exceptional," the concurrence relies on four United States Supreme Court cases: *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983); and *Puyallup Tribe, Inc. v. Dept. of Game*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). But only one of those cases, Puyallup, involved the state's assertion of jurisdiction over tribal members on the reservation. The other three involved the state's assertion of jurisdiction over the activities of *non-tribal members* on the reservation. The Supreme Court has differentiated between the assertion of state jurisdiction over the activities of tribal members, versus non-tribal members, on the reservation. *See Cabazon*, 480 U.S. at 215–16, 107 S.Ct. 1083 (describing *Moe* and *Colville* as cases involving the assertion of jurisdiction over the on-reservation activities of nonmembers).

As noted, we have twice before considered whether section 243.166 is civil or criminal in nature. *Kaiser v. State*, 641 N.W.2d 900, 907 (Minn.2002); *Boutin v.*

*LaFleur,* 591 N.W.2d 711, 717 (Minn.1999). In *Boutin,* the defendant complained that requiring him to register as a sex offender violated his substantive due process rights because, although he was initially charged with one of the enumerated offenses for which registration was required, the offense to which he eventually pleaded guilty was not one of the enumerated offenses. 591 N.W.2d at 716. We held that section 243.166 is not criminal in nature, and therefore did not infringe upon Boutin's substantive due process rights, specifically, the presumption of innocence. *Id.* at 717. We pointed out that the predatory offender statute does not require an affirmative restraint, that historically similar registration statutes have not been regarded as punishment, that it does not promote the traditional aims of punishment because it does not involve confinement and is not intended to exact retribution, and that the primary purpose of the statute is to create an offender registry to assist in law enforcement investigations. *Id.*

In *Kaiser,* we reiterated that section 243.166 is regulatory and non-punitive in nature, and therefore the state was not required to advise a defendant that registration would be required as a consequence of a plea of guilty to one of the enumerated offenses for which registration is required. 641 N.W.2d at 907. We again observed that "the predatory offender law seeks to increase public safety by requiring a specific class of offenders to provide information to law enforcement authorities to assist in keeping track of them," and we likened the statute to others that require offenders to obey special regulations, such as statutes criminalizing the possession of firearms by a convicted felon and statutes revoking driving privileges after a conviction of driving under the influence. *Id.* at 905–06. We further

noted that section 243.166 "is an expression of a policy statement—'society has the right to know of predatory offenders' presence not in order to punish them, but in order to protect itself.'" *Id.* at 905 (quoting *Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 373 (1995)).

Here, the court attempts to distinguish *Boutin* and *Kaiser* on grounds that "section 243.166 has been significantly revised since these cases were decided." Since we decided *Boutin* and *Kaiser,* the statute has been amended to increase the offense grade for a first violation, impose the registration requirement for additional offenses, lengthen the registration period for certain offenses, and modify other procedural requirements. Act of Apr. 3, 2000, ch. 311, art. 2, 2000 Minn. Laws 185, 189–207. But the statute has not been amended in ways that change its fundamental regulatory nature. For example, the statute still does not restrict an offender's ability to change residences or to move out of state. The registration requirement is still not permanent; Boutin and Kaiser were required to register for only ten years, as is respondent here. Minn.Stat. § 243.166, subd. 6(a) (2002). The registry is still considered private data under the Minnesota Government Data Practices Act. *Id.,* subd. 7. And while any violation is now considered a felony, under the version of the statute under which Boutin and Kaiser were prosecuted, a second violation was also considered a felony. Minn.Stat. § 243.166, subd. 5 (1998). The revisions to the 1998 version of the statute the court characterizes as "significant" are not relevant to the question we must answer in this case, that is, whether the state may enforce it against a tribal member convicted under state law who resides on the reservation of his tribe.[1]

1. Having attempted to distinguish *Boutin* and      *Kaiser* on grounds that "section 243.166 has

The court also supports its conclusion with the rationale that neither *Boutin* nor *Kaiser* "addressed the classification of [the section] under the *Cabazon/Stone* test." I find that observation troubling. That neither Boutin nor Kaiser were Native Americans should not inform the court's classification of the statute. Our determination of the nature of the Registration of Predatory Offenders statute should remain the same regardless of which test we apply, and regardless of the nationality of the offender. In other words, the statute is either civil and regulatory, or it is criminal and prohibitory. I fail to understand how we can conclude that the statute is civil and regulatory when applied to non-Native Americans and to Native Americans who reside off the reservation, while at the same time concluding that the statute is criminal and prohibitory when applied to Indians who reside on the reservation. Such a result is absurd.

Nor do I believe the court fully understands the implications of its holding today. By concluding that section 243.166 is criminal and prohibitory when applied to Indians who reside on the reservation, the court must also conclude that the constitutional issues raised by Boutin and Kaiser are alive and well when section 243.166 is enforced against such offenders. For example, if the statute is criminal when applied to Native Americans, then the court must conclude that, as Boutin argued, it violates a Native American's due process rights to require him to register when he has been only accused, but not convicted,

been significantly revised since these cases were decided," the court then claims it is not really necessary to distinguish them at all because " 'punitive' is not the same as 'prohibitory,' and the definition of 'regulatory' under the *Kennedy* analysis of *Boutin* and *Kaiser* does not have the same meaning as 'regulatory' employed by Pub.L. 280 and *Cabazon*." In *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), the Supreme Court outlined the factors to be used in analyzing whether a statute is "penal" (and therefore invokes a defendant's constitutional right to substantive due process) or "regulatory." Those factors include

[w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment— retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 168–69, 83 S.Ct. 554 (footnotes omitted).

We applied the foregoing factors in concluding in *Boutin* that the statute was "regu-

latory." 591 N.W.2d at 717. These factors are remarkably similar to the factors the court now applies under the "shorthand test" in determining that the statute is criminal and prohibitory when applied to Native Americans residing on the reservation. For example, in *Boutin* we observed first that section 243.166 "does not require an affirmative disability or restraint," nor does it "restrict Boutin's ability to change residences at will or even to move out of state." *Id.* In this case, the scope of the conduct at issue is the first factor the court considers; the statute still does not restrict the offender's ability to change residences at will or to move out of state entirely. Similarly, the *Kennedy* test we applied in *Boutin* considers the need for scienter in concluding that a statute is punitive; in this case, the court concludes that the "blameworthiness" of the actor is a factor to be considered in finding the statute to be prohibitory. Use of similar analytical approaches, whether derived from *Kennedy*, as in *Boutin* and *Kaiser*, or from the *Cabazon* "shorthand" test applied in this case, should not produce a dissimilar result based on the defendant to whom it is applied.

Given the similarity in analytical approaches, the court's attempt to clarify the differences between the result reached in *Boutin* and *Kaiser*, on the one hand, and the result reached in this case, on the other, only serves to highlight the disparity in treatment.

of one of the enumerated offenses. If the statute is criminal when applied to Native Americans, the court must also conclude that, as Kaiser argued, a Native American's due process rights are violated if he is not advised, before agreeing to a guilty plea, that he will be required to register as a consequence of the plea.

In concluding that section 243.166 is generally prohibitory and therefore criminal, the court also relies on *State v. Busse*, 644 N.W.2d 79 (Minn.2002). In *Busse*, we held that Minnesota has jurisdiction to enforce Minn.Stat. § 171.24, subd. 5 (1998), against an enrolled tribal member who was driving on his reservation although his license had been revoked. 644 N.W.2d at 88. We held that the conduct in question, driving after cancellation as inimical to public safety, presents heightened public policy concerns and is a criminal and prohibitory offense. *Id.* at 80. The statute at issue in *Busse* dealt with the narrow conduct of driving after cancellation and prohibited any driving by *anyone* whose driver's license had been cancelled. In contrast, Minn.Stat. § 243.166 does not purport to bar registered offenders from living in certain areas or communities, and does not prohibit them from moving, either within the state or into or out of the state. Rather, the statute only requires that a registrant notify the state of his or her address.[2]

The court also concludes the statute is criminal and prohibitory by focusing on the narrow activity of "an identified predatory offender residing or moving without maintaining a current address registration

with the proper authorities," which happens to be the very thing barred by the statute. As we cautioned in *State v. Stone,* if we simply focused on the specific conduct prohibited by an individual statute, we could classify virtually every statute on the books as criminal under Pub.L. 280. 572 N.W.2d 725, 729–30 (1997). In equating the mandatory registration requirement to a prohibition, the court engages in precisely the reasoning we cautioned against in *Stone.*

In *Stone*, we listed four non-exhaustive factors useful in determining whether an activity violates the state's public policy in a way serious enough to be considered criminal. *Id.* at 730. Specifically, we are to consider:

> (1) the extent to which the activity directly threatens physical harm to persons or property or invades the rights of others; (2) the extent to which the law allows for exceptions and exemptions; (3) the blameworthiness of the actor; (4) the nature and severity of the potential penalties for a violation of the law.

*Id.* Clearly, the last two factors—the blameworthiness of the actor and the severity of the penalties for violation—support the criminal nature of the statute. Predatory offenders who "knowingly fail to register" are blameworthy, and the statute provides severe penalties for such knowing failure.

But it is also clear that a predatory offender's failure to register does not directly threaten physical harm to persons or property, nor invade the rights of oth-

2. The court characterizes section 243.166 as permitting "residing at or moving to any address * * * *except by predatory offenders who fail to maintain a current address registration* as required by the relevant statute." (Emphasis added.) I find nothing in section 243.166 that bars offenders from moving, whether they register or not. Nothing in the statute requires offenders to request permission of the state before moving, and nothing in the statute allows the state to approve or disapprove of an offender's new residence. The conduct at issue, whether characterized as narrow or broad, is neither the residing nor the moving itself, but the failure to register.

ers. And, while registration aids the police in locating predatory offenders, an offender's failure to register, by and in itself, does not directly cast the possibility of physical harm on the community at large. Moreover, because the statute punishes only those predatory offenders who "knowingly fail to register," it can be argued that the statute provides an exception for those offenders who are unaware of the registration requirement. Finally, as we stated in *Stone*, these four factors are not exhaustive; rather, they function only as an aid to the ultimate determination of whether particular conduct is permitted or prohibited. *Id.* at 730. The fact that the statute generally permits a predatory offender to reside in Minnesota and to move into and out of the state should govern the court's determination as to the nature of the statute.

For these reasons, I would conclude that the registration requirement of section 243.166 is civil, rather than criminal, in nature and thus the state's enforcement of it against Native Americans residing on the reservation is not specifically authorized by Pub.L. 280.

Finally, I note that this entire question will soon be a solution in search of a problem. In July 2006, Congress passed and the President signed the Adam Walsh Child Protection and Safety Act of 2006. Pub.L. No. 109–248, 120 Stat. 587 (to be partially codified at 42 U.S.C. §§ 16901–16991). The Adam Walsh Act, like its predecessor the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, requires registration of sex offenders, but specifically requires registration "in each jurisdiction where the offender resides, where the offender is an employee, and where the of-

fender is a student." Adam Walsh Act § 113(a), 120 Stat. at 593.[3] Significantly for this case, the Adam Walsh Act explicitly brings federally recognized Indian tribes within its jurisdiction, § 111(10)(H), 120 Stat. at 593, and requires those tribes to either maintain a registry of offenders or delegate the registration requirement "to another jurisdiction or jurisdictions within which the territory of the tribe is located." § 127(a)(1), 120 Stat. at 599–600. A tribe that does not elect, within one year of passage of the Adam Walsh Act, to maintain its own registry of offenders is deemed to have elected to delegate that function to another jurisdiction. § 127(a)(2), 120 Stat. at 600. Also significant is the fact that the Adam Walsh Act authorizes the attorney general to make the act applicable to sex offenders convicted before passage of the Adam Walsh Act or its implementation in a particular jurisdiction. § 113(d), 120 Stat. at 594.

Under the Adam Walsh Act, therefore, sex offenders who are members of federally recognized Indian tribes will be required to register, regardless of where they reside. If they reside on the reservation, they will be required to register with the tribe (or with the state, if the tribe has delegated, either explicitly or implicitly, its registry to the state). If they reside on the reservation but work or go to school off the reservation, they will be required to register with the state as well.

Jurisdictions are generally given three years from passage of the Adam Walsh Act to comply, § 124(a), 120 Stat. at 598, meaning that by July 2009 all Native American sex offenders like Jones will unquestionably be subject to registration, either with the state or with a tribe or both,

---

**3.** The Adam Walsh Act also broadens the definition of "sex offense" such that those convicted in tribal courts are explicitly deemed sex offenders. § 111(1), (5), (6), 120 Stat. at 591–92.

and the problem presented by this case will have gone away. Unfortunately, the court's holding in this case will not.

I respectfully dissent.

ANDERSON, Russell A., Chief Justice (dissenting).

I join in the dissent of Justice Page.